**UNITED PAPERWORKERS
INTERNATIONAL UNION,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent,**

**Georgia–Pacific Corporation, Intervenor.**

No. 91–6260.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 2, 1992.

Decided Dec. 2, 1992.

Lynn Agee (briefed), Mark Brooks, United Paperworkers Intern. Union, Nashville, Tenn., Peter M. Fox (argued), Thomas J. Kircher, Kircher, Robinson, Cook, Newman & Welch, Cincinnati, Ohio, for petitioner.

Aileen A. Armstrong, Deputy Associate Gen. Counsel, Peter Winkler, Joseph Oertel (argued and briefed), N.L.R.B., Office of the Gen. Counsel, Washington, D.C., Linda Rabin, N.L.R.B., Region 7, Detroit, Mich., for respondent.

Carl E. VerBeek (argued and briefed), Varnum, Riddering, Schmidt & Howlett, Grand Rapids, Mich., for intervenor.

Before: KEITH, JONES, and BOGGS, Circuit Judges.

PER CURIAM.

Petitioner, United Paperworkers International Union (the "Union"), seeks review of the decision and order of the National Labor Relations Board ("NLRB") which dismissed, in its entirety, the unfair labor practice complaint against Georgia–Pacific Corporation ("Georgia–Pacific" or the "Company"). The NLRB found that Georgia–Pacific had not engaged in unfair labor practices in violation of 29 U.S.C. § 158(a)(5) and (1) ("Section 8(a)(5) and (1)"). For the reasons stated below, we AFFIRM.

I.

Georgia–Pacific's Kalamazoo Paper Division manufactures paper and corrugated containers. In 1987, the Union's Local 25

represented a unit of 130 production employees at the Kalamazoo plant. The most recent collective bargaining agreement covering this unit was in effect from May 1, 1984 to May 1, 1987. The Union's complaint arises out of the negotiations that took place between the Union and Georgia–Pacific to renew this agreement during 1987.

Beginning in March of 1987, the parties began posturing for the ensuing negotiations. At that time, Resident Plant Manager, David Norman, informed Local Union President Adrian Smothers that the plant's financial condition was profitable, but that management could show a paper loss by assigning corporate charges and losses to the Kalamazoo plant. Similarly, an April 15, 1987, meeting with Georgia–Pacific's Vice–President of Northeast Operations produced representations that negotiations would be difficult, that the plant was not financially healthy, and that things did not look as good as they should. The vice-president further indicated that during these negotiations considerable concessions would have to be made by the union.

Formal negotiations took place between April 20 and July 22, 1987. Clare Annen ("Annen") and James T. Wright ("Wright") were the spokespersons for the Union and Georgia–Pacific, respectively. A chronology of the representations and proposals made at these meetings follows.

At the first negotiating session on April 20, the Union and Georgia–Pacific set an agenda for the negotiations. Discussions for the next several meetings were to include possible modifications of the existing pension plan and premium pay practice and greater flexibility in job assignments for unit employees. According to Annen and others present at this initial meeting, Wright characterized the Kalamazoo facility as "troubled" and stated that the economic outlook for the plant was not "too rosy". Wright further stated that competition from both foreign producers and other Georgia–Pacific plants, where production was more efficient and attendant costs were cheaper, was the cause of this bleak outlook.

At the April 24 meeting, Annen asked Wright if the Kalamazoo plant was losing money. In response, Wright stated that, while the plant was losing money, he was not willing to prove it. Wright then characterized the plant as a "good performing operation" and indicated that the plant would not be sold.

Responding to the financial instability line of inquiry at the June 12 meeting, David Reynolds, Georgia–Pacific's Vice–President of Human Resources, informed the Union that Georgia–Pacific was probably the wealthiest company in the industry. According to the recording secretary, Reynolds further stated, "We are not an impoverished Company. We are not pleading poverty in this location, but Mr. Annen, when you tell these people that the Company has all the tools, you're playing with their jobs." When asked why Georgia–Pacific was now asking for concessions, Reynolds replied that the management was just seeking more productivity.

At the June 18 negotiation session, Wright complained that the Union was stalling the negotiations by not submitting any proposals. He stated that this inaction by the Union was causing the Kalamazoo plant to lose money by the "bucketful".

At the July 1 meeting, Thomas Sullivan, who replaced David Norman as plant manager of the Kalamazoo facility, told the Union that the plant had sustained losses in each of the two previous years. Wright, however, insisted that Georgia–Pacific was not pleading poverty. Moreover, in light of what Wright characterized as continued stalling by the Union, Georgia–Pacific presented its "final offer" to the Union. The cover page included the following statement:

> Because the productivity improvements and savings contained herein are very important to the mill, unless an acceptable proposal is received from the Union in the meeting for July 10, 1987, this offer shall become the Company's final offer.

The proposal included the following major changes: the transfer of unit employees from the Union's pension plan to the Com-

pany's pension plan, the reformulation of the premium pay practices, flexibility in unit work assignments, and a two-percent wage increase.

By letter on July 8, the Union requested that "financial data" on the Kalamazoo operation be made available at the July 10 meeting. The Union stated that Georgia–Pacific had given "conflicting views" on the financial condition of the Company, and that such information was necessary to "properly represent" their membership.

Georgia–Pacific responded to the Union's request by presenting a letter to the Union near the close of the July 10 bargaining session. The correspondence from Wright to Annen read:

This letter is intended to clarify the Company's position and to respond to your July 8, 1987 letter. It is unfortuniate [sic] that you are confused about the Company's statements but I can assure you that any confusion you may have was not caused intentionally by the Company. We are responding to your letter as follows:

I.   We are not pleading poverty and have not plead [sic] poverty or inability to pay. We are only claiming that we are unwilling to pay wages and fringe benefits which we believe will make competition more difficult.

II.  Georgia–Pacific is a publicly held corporation and its full operating results have been disclosed to the public and to our stockholders. We believe that you and your International have the information regarding the Company's operating results.

III. Although we are not admitting any legal obligation to do so, since you are particularly interested in the operating results, including financial data, for the Kalamazoo Division, we are willing to make an informal disclosure of the Kalamazoo Division's operating results for the past 2 years by showing copies of the monthly profit and loss statements to two employee members of

the Union's Bargaining Committee provided:

1.   The two individuals and the Union will agree to keep the information confidential i.e. it will not be disclosed outside the bargaining unit, and

2.   The process of disclosing these records will not further delay the bargaining process.

We are concerned that this late request not impede the overall bargaining process. We have been meeting with you, in numerous meetings, since April 20 and have repeatedly indicated that we would supply you with the information you need in order to keep the bargaining process moving in a timely manner, and that necessary to comply with the legal requirements. Further, your request for financial data is so broad that it is impossible to know what you claim you need. Our objective is to reach an agreement as promptly as possible.

Wright later testified that, because of confidentiality concerns, Annen was to be screened from review of the information because Annen dealt with Georgia–Pacific's competitors in his capacity as an international representative.

At the July 10 meeting, the parties agreed to some minor changes in the pension proposal. Wright also agreed to meet on July 15, not to negotiate, but to illuminate further the terms of Georgia–Pacific's "final offer". He later sent a confirmatory memorandum stating that the sole purpose of the July 15 meeting was to clarify the terms of the July 1 proposal.

On July 15, Plant Manager Sullivan asked Annen to specify what financial records the Union desired. Annen requested information regarding Georgia–Pacific's "spending for operating", the financial projections over the next couple of years, and a list of assets and liabilities. Sullivan reiterated that the information could not be accessed by Annen. Other Union representatives asserted that, with this contingency, the information would be of no use to them. The scheduled meeting that took place later in the day, which Georgia–Pacific scheduled to clarify its last offer, ended

in discord when Annen attempted to make the meeting a negotiation session.

On July 16, Sullivan wrote to Annen and indicated that Georgia–Pacific perceived that the negotiations were deadlocked and that, because the existing contract would expire on July 22, Georgia–Pacific would then implement its final proposal. Sullivan wrote in pertinent part:

> We believe the negotiations are deadlocked. Because the Union did not make an acceptable proposal to the Company in either meeting of July 10th or July 15th, we are definitely at an impasse. Therefore, we will terminate the existing labor agreement at 7:00 a.m. on Wednesday, July 22, 1987, and will implement the terms of the July 1st proposal, as modified on July 10th, at that time.

He further reiterated that Georgia–Pacific was profitable overall, and that the Company was not pleading an inability to pay. He stated that the financial production at the Kalamazoo plant made it difficult for the plant to compete. Sullivan then observed that the proposal on the table was "important to the future of the Division."

On July 22, the Company implemented several provisions of its final offer. Three important contract concessions were included. First, Georgia–Pacific implemented the proposal in which these employees would be transferred to the Company's own pension plan. The Union had proposed to continue covering employees for an additional five years under the jointly administered Paper Industry Union Management Pension Fund. Second, Georgia–Pacific implemented a practice of more flexibility in work assignments by seeking to shift work assignments not only among employees in the production unit represented by the Union, but also between that unit and a unit represented by another union. The Union refused to negotiate this matter, claiming that the expiring contract sufficiently defined the unit of work for assignment purposes.

Third, Georgia–Pacific sought to eliminate premium pay except for work in excess of eight hours per day or forty (40) hours per week. The expiring contract required premium pay for work on Saturdays, Sundays and scheduled days-off, regardless of the hours worked. The Union did not make a counteroffer, claiming that Georgia–Pacific had not provided sufficient financial data to assess the offer.

The Union filed unfair labor practices charges against Georgia–Pacific on July 20, 1987 and August 3, 1987. These cases were consolidated on September 30, 1987 in a complaint which alleged that Georgia–Pacific refused to bargain with the Union in violation of §§ 8(a)(1) and (5) of the National Labor Relations Act ("NLRA"). Specifically, the complaint alleges that Georgia–Pacific violated the statute by refusing to provide financial records that were necessary and relevant to the Union's performance of its function as the exclusive collective bargaining representative of the employees by unilaterally implementing its contract proposals without reaching impasse.

Following the institution of this action before the NLRB, Georgia–Pacific provided Annen some of the requested financial data on September 10. Annen made a further request for information on September 11. The parties, however, did not meet until September 15. At that meeting, Annen informed Wright that the data provided by Georgia–Pacific did indicate that the company was paying its bills on time and was not in financial difficulty. Wright, however, declined to discuss the financial data.

In an April 4, 1989, opinion, the administrative law judge ("ALJ") stated that, in demanding concessions, Georgia–Pacific did not assert an inability to pay, but was motivated by its desire to increase its competitive standing and profits by reducing labor costs. Because Georgia–Pacific was not pleading an inability to pay, the ALJ held that the NLRA did not require the Company to disclose financial information in support of its bargaining position. The ALJ also found that Georgia–Pacific bargained in good faith to impasse with the Union and, therefore, was permitted to implement unilaterally its last contract offer. Following an administrative appeal of the decision, the National Labor Relations

Board (the "Board") adopted the findings and conclusions of Administrative Law Judge Peter E. Donnelly in its decision and order of September 30, 1991. This timely appeal followed.

## II.

As a general proposition, Section 8(a)(5) of the NLRA states that an employer engages in unfair labor practices if it "refuse[s] to bargain collectively with the representatives of his employees...." 29 U.S.C. § 158. The Supreme Court has imputed a requirement of good faith in bargaining upon the employer and that includes the duty "to provide information that is needed by the bargaining representative for the proper performance of its duties." *NLRB v. Acme Industrial Co.*, 385 U.S. 432, 435–36, 87 S.Ct. 565, 568, 17 L.Ed.2d 495 (1967).

The Union challenges the Board's finding that Georgia–Pacific did not act in bad faith in violation of the NLRA. The Union first challenges the Board's determination that Georgia–Pacific demanded concessions because it wanted to increase profits. The Union's representative argues that Georgia–Pacific made pleas of poverty throughout the negotiations and deprived them of information essential to the negotiation process. Second, the Union challenges the Board's determination that, because an impasse had been reached, Georgia–Pacific could unilaterally implement its final contract offer. We address each of the Union's claims seriatim below.

The Board's findings of fact and its application of the law to those facts are *conclusive* "if supported by substantial evidence on the record considered as a whole". 29 U.S.C. § 160(e); *Dayton Typographic Service Inc. v. NLRB*, 778 F.2d 1188, 1191 (6th Cir.1985); *see e.g., NLRB v. Fry Foods, Inc.*, 609 F.2d 267 (6th Cir.1979). Where the Board has found no violation and dismissed the unfair labor practices complaint, that finding "must be upheld unless it has no rational basis" or is "irrational or unsupported by substantial evidence." *United Mine Workers of America, District 31 v. NLRB*, 879 F.2d 939, 942 (D.C.Cir.1989).

Because each of the Board's findings were based on substantial evidence, we AFFIRM the Board's order adopting the ALJ's findings made in accordance with settled principles of labor law.

## A.

In *NLRB v. Truitt Manufacturing Co.*, 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956), the Supreme Court stated that an employer's "refusal to attempt to substantiate a claim of inability to pay increased wages may support a finding of a failure to bargain in good faith." *Id.* at 153, 76 S.Ct. at 756. The Court rationalized this governing principle by observing that if such an assertion is "important enough to be present in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy." *Id.* at 152–53, 76 S.Ct. at 756.

In *NLRB v. Harvstone Manufacturing Corp.*, 785 F.2d 570 (7th Cir.), *cert. denied*, 479 U.S. 821, 107 S.Ct. 88, 93 L.Ed.2d 41 (1986), the Seventh Circuit observed:

It is well established that when an employer makes a claim of financial inability to pay a proposed wage rate, it generally has an obligation, in order to meet its duty to bargain in good faith, to provide substantiating financial data to its employees' bargaining representation upon request. Although no magic words are required to express an inability to pay, the words and conduct must be specific enough to convey such a meaning.... [T]he mere assertion by an employer that it is operating at a competitive disadvantage does not, in and of itself, constitute a claim of inability to pay. The relevant test, as articulated by this court, is to ascertain whether the employer said it "would not" as opposed to "could not" pay the employee's proposed demands. Only in the latter situation where the employer communicated that it "could not" pay the demands has it made a claim of inability to pay.

*Id.* at 575–76 (citations and footnote omitted). *See also Washington Materials, Inc. v. NLRB*, 803 F.2d 1333, 1338–39 (4th Cir.

1986).[1] Within this framework, we must determine whether Georgia–Pacific's bargaining representations amounted to a plea of poverty or inability to pay.

Each of the representations made by the negotiators for Georgia–Pacific is consistent with the Company's desire to increase its competitive position. The pre-negotiation comments made by Georgia–Pacific surrogates amounted to little more than posturing for the ensuing negotiations. In each of the actual negotiating sessions, Georgia–Pacific continually reiterated that, while the Kalamazoo plant was not faring well, the Company was not pleading poverty. Wright stated that competition from both foreign producers and other plants was the principal cause of the plant's troubles, and Union concessions were needed to alleviate that competitive imbalance. Further representations, indicating that the plant would not be sold; that the Kalamazoo plant was a good performing operation but just was not doing as well as it should; and that Georgia–Pacific was indeed a wealthy organization, tend to affirm Georgia–Pacific's contention that it simply wanted more economic production from the Kalamazoo operation.

Moreover, in each of the correspondences from Wright to Annen, Georgia–Pacific indicated that it was not asserting an inability to pay. Rather, the Company explicitly stated that it was seeking certain concessions to increase its competitive standing. Finally, we note that Annen did acknowledge that the data provided to him by Georgia–Pacific indicated that the plant was paying its bills on time.

Accordingly, substantial evidence does support the Board's finding that Georgia–Pacific's negotiators "disavowed any plea of poverty." The record is replete with representations that the Kalamazoo plant was not financially healthy. This same record, however, substantiates Georgia–Pacific's asserted desire to improve its standing among its competitors. The Board could reasonably determine that Georgia–Pacific's demand for concessions was rooted in its desire to maximize its profits and not in a plea of poverty. In other words, Georgia–Pacific represented that it "would not" rather than it "could not" meet the Union's demands. Accordingly, the Board made a rational conclusion when it determined that the Company was not required to release financial documents. Therefore, the Board properly dismissed this complaint.

## B.

■ An employer may not alter the existing terms and conditions of employment in a collective bargaining agreement without first bargaining to *impasse* with the union over the terms. *Peabody Coal Co. v. NLRB*, 725 F.2d 357, 365 (6th Cir.1984); *NLRB v. Allied Products Corp.*, 548 F.2d 644, 652 (6th Cir.1977). The District of Columbia Circuit recently stated:

[A]n employer may unilaterally implement its proposals upon impasse in negotiations. *"After bargaining to impasse, that is, after good-faith negotiations have exhausted the prospects of concluding an agreement, an employer does not violate the Act by making unilateral changes that are reasonably comprehended within his pre-impasse proposals."* American Fed'n of Television & Radio Artists v. NLRB, 395 F.2d 622, 624 (D.C.Cir.1968) (emphasis added); see also *Emhart Indus. v. NLRB*, 907 F.2d 372, 377 (2d Cir.1990); *Lapham–Hickey Steel Corp. v. NLRB*, 904 F.2d 1180, 1185 (7th Cir.1990); *Southwest Forest Indus., Inc. v. NLRB*, 841 F.2d 270, 273 (9th Cir.1988); *United Steelworkers v. Fort Pitt Steel Casting Div.*, 635 F.2d 1071, 1078 (3d Cir.1980), *cert. denied*, 451 U.S. 985, 101 S.Ct. 2319, 68

---

1. In *American Model and Pattern, Inc. v. NLRB*, 816 F.2d 678 (6th Cir.1987) (unpublished per curiam), this Court stated:

The obligation to provide financial information arises, however, only if the employer claims an *inability* to pay, not merely an *unwillingness* to pay.... To determine how properly to characterize the employer's protestation, the Board must consider all the surrounding facts and circumstances, not just the precise words used.... Refusing to agree to a proposed wage increase in order to "remain competitive" does not, standing alone, reflect a proclaimed inability to pay.

Slip op. at 14 (emphasis original, citations omitted).

L.Ed.2d 843 (1981); *Omaha Typographical Union, No. 190 v. NLRB*, 545 F.2d 1138, 1142 n. 4 (8th Cir.1976).

*NLRB v. McClatchy Newspapers, Inc.*, 964 F.2d 1153, 1165 (D.C.Cir.1992) (emphasis in original).

■ The Union contends that the parties did not reach impasse on any of the three Georgia–Pacific proposals implicated on this appeal. The record reflects, however, that the Union was unwilling to negotiate the flexibility of interunit work assignments. The Union argued that this was adequately taken into account in the previous agreement and refused to discuss the matter. Moreover, the record further reflects the Union failed to negotiate the premium pay proposal, claiming that it was unable to assess accurately Georgia–Pacific's offer because the Union's representatives lacked sufficient financial data to evaluate the offer. We note that the Union, on these facts, was not entitled to the information that it requested and, therefore, was not unduly inhibited from making a counterproposal. Finally, the record reflects that, during the July 10 session, the parties negotiated only minor changes in the proposed transfer of pension plans from the Union to Georgia–Pacific. These alterations did not affect the gravamen of the Company's initial proposal, and its desire to absorb all of its employees in Georgia–Pacific's overall pension plan.

The ALJ found that "no progress was made on any of these major items throughout any of the nine bargaining sessions.... [Any] further negotiations would not have produced agreement on any of the significant, indeed crucial matters ..., and the parties were aware of their stalemate on these issues since they persisted from start to finish to date." We hold that substantial evidence on the record as a whole does support the ALJ's conclusion that the parties had reached impasse with regard to these issues. Accordingly, Georgia–Pacific was well within the dictates of the NLRA when it unilaterally implemented the proposals in its final offer. Therefore, we **AFFIRM** the Board's adoption of the ALJ's finding that Georgia–Pacific did not engage in any conduct violative of the NLRA.