NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0422n.06
Filed: June 20, 2007

No. 05-2590

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | |
|---|---|
| Northern Michigan Building & Construction Trades Council and its Affiliated Unions, | ) |
| | ) |
| | ) |
| *Petitioners*, | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| National Labor Relations Board, | )On Petition for Review of an Order |
| | )of the National Labor Relations Board |
| *Respondent*, | ) |
| | ) |
| and | ) |
| | ) |
| | ) |
| Zurn/N.E.P.C.O., | ) |
| | ) |
| *Intervenor*. | ) |

Before: **DAUGHTREY, Circuit Judge; COOK, Circuit Judge**; and **WEBER, Senior District Judge**.*

**PER CURIAM.** The Northern Michigan Building & Construction Trades Council and its

affiliated unions ("Union") petition the court to review a final decision of the National Labor

Relations Board ("Board"). The decision found portions of an unfair labor practice complaint filed

_____

*The Honorable Herman J. Weber, Senior Judge for the United States District Court for the Southern District of Ohio, sitting by designation.

1

by the Union against Zurn/N.E.P.C.O. ("Zurn") to have merit and dismissed other portions of the complaint as being without merit. Zurn has intervened in this proceeding on the side of the Board. This court has jurisdiction over the proceeding pursuant to § 10(a) and (f) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 160(a) and (f).

## I. Background

The facts giving rise to the complaint are set forth in the decision issued by the Board in this matter on August 22, 2005. *See Zurn/N.E.P.C.O.*, 345 NLRB No. 1 (2005). The pertinent facts are summarized herein.

Zurn is a general contractor headquartered in Washington and Maine. The Union is composed of member unions representing various trades, including pipefitters, ironworkers, electricians, carpenters, millwrights, sheet metal workers, and operating engineers. A local consortium contracted with Zurn to build a cogeneration plant in Cadillac, Michigan. Before it began hiring for the project in April 1992, Zurn entered into an arrangement with a state agency, the Michigan Employment Security Commission ("MESC"), to register applicants for jobs at the project and to process their applications. In late January 1992, after numerous union members had attempted to apply for jobs directly with Zurn, Zurn informed the Union that it would not be accepting direct applications, but instead MESC would process all applications. The Union then began sending its members to the MESC office to register for positions. At least 349 applicants with union affiliations ultimately registered with MESC.

Zurn came to a special arrangement with MESC called a "custom referral arrangement." Under this arrangement, instead of referring qualified individuals to Zurn in the order in which they registered, MESC agreed to honor Zurn's priority hiring system, known as "policy 303." The policy

2

gave priority in hiring to qualified applicants who were present or former employees of Zurn, or who had appropriate work experience and had been referred by current managers, supervisors, or employees of Zurn. Thus, MESC would register individuals with priority under policy 303 and refer them to Zurn on a "name call" basis ahead of other nonpriority registrants, including those who had registered before the priority registrants.

In April of 1992, construction work began on the Cadillac project. Thirteen pipefitters and other individuals were hired in the first few months. In May, the Union began scheduling regular organizing meetings with Zurn's employees, which were attended by the 13 pipefitters and several carpenters. On May 18, Zurn's resident manager assembled the employees, announced that soliciting was prohibited, and threatened to fire anyone caught soliciting. A few days later, Zurn laid off the four electricians it had hired.

On June 2, several of the unions notified Zurn of their organizing efforts and identified their employee organizers. Sometime in early June, the pipefitting crew began wearing union insignia on the jobsite. On June 12, the Union notified Zurn's superintendent that seven pipefitters, among others, were members of the organizing committee and that it was demanding recognition on behalf of Zurn's employees at the Cadillac jobsite.

On June 18, the Union held a rally at Zurn's gate, which was attended by pipefitting crew members on their lunchbreak. The pipefitters returned to work wearing union insignia. That afternoon, Zurn laid off the entire pipefitting crew, ostensibly for lack of work. The following month, Zurn hired two firms to complete the piping work. Zurn then began its main hiring of construction craft workers to build the plant, with the last hires occurring in April 1993.

Unfair labor practice charges were filed against Zurn on July 1, September 2, October 19,

November 13, and December 4, 1992. On December 5, several of Zurn's employees struck over Zurn's alleged labor law violations, including its failure to hire union applicants. Other employees and individuals joined the strike activity. On December 8, the Union contacted Zurn and made an unconditional offer to return to work. Around December 9, MESC discontinued making "name call" referrals to Zurn, reverting to its usual "first in, first referred" method in reaction to Zurn's requesting 70 more "name call" applicants on a preferred basis.

After the strike began, Zurn attempted to contact 39 union applicants, identified as discriminatees in the Union's charges filed with the Board, with alleged offers of employment. Many of these applicants expressed interest in employment, but only one was ultimately hired.

The Administrative Law Judge ("ALJ") who heard the case found that over the course of the Cadillac project, approximately 1700 persons registered with MESC to work for Zurn, and 1057 completed MESC "Form 2511." Of those applicants, 439 had union backgrounds. Zurn hired 202 employees in the trades the Union sought to represent: carpenters, millwrights, ironworkers, pipefitters, boilermakers, electricians, and operating engineers. According to the Board, 50 of the successful applicants had union backgrounds. According to evidence submitted by Zurn, 169 of those hired, including 17 with union backgrounds, were hired pursuant to Zurn's special referral arrangement with MESC. The remaining 33 were hired according to MESC's regular referral processes. Of those, 15 had union backgrounds.

The Cadillac project was completed in August 1993. Zurn never recognized the Union as the representative of any of its employees on that job.

Based upon the Union's unfair labor practice charges, the Board's General Counsel issued several complaints alleging that Zurn had violated the Act by, among other acts and omissions,

4

refusing to hire qualified applicants because of their union membership and affiliation; refusing to consider such applicants for hire; laying off and failing to recall numerous union supporters; threatening and interrogating employees; and discriminatorily enforcing a no-solicitation rule. The matter was tried before an ALJ between June 1993 and May 1994. The ALJ issued his initial decision on October 27, 1995. The Board remanded the matter to the ALJ. The ALJ issued his First Supplemental Opinion on February 24, 1997. The Board subsequently remanded the case to the ALJ to make further findings in accordance with the decision in *FES (a Division of Thermo Power) & Plumbers & Pipefitters Local 520 of the United Assoc.*, 331 NLRB 9 (2000), *appeal after remand*, 333 NLRB 66 (2001), *enforced*, 301 F.3d 83 (3rd Cir. 2002). On September 6, 2001, the ALJ issued his Second Supplemental Decision. The Board thereafter issued its decision from which this appeal is taken.

## II. The Board's Decision

The Board adopted in part and rejected in part the findings of the ALJ. The Board determined that the first two elements of a refusal-to-hire violation as set forth in *FES* were satisfied; that union animus had infected a number of Zurn's hiring decisions; and that Zurn had failed to show that it would have made the same decisions in the absence of the applicants' union affiliations.

The Board found, however, that policy 303 is not inherently discriminatory because it does not, either by its terms or necessary operation, discriminate in hiring among individuals on the basis of union membership or nonmembership. The Board found that the policy "does not on its face preclude or limit the possibilities for consideration of applicants with union preferences or backgrounds." The Board acknowledged that policy 303 does give preference to applicants who were either current or previous employees of Zurn and thus were "known quantities" to Zurn, or who were

known to managers, supervisors and current employees of Zurn who were willing to vouch for them as potential employees. The Board stated that in its view, however, the policy was "a rational hiring practice for an employer that is trying to attract a qualified, dependable work force, and does not necessarily indicate an invidious motive."

The Board also found the record does not indicate that Zurn implemented policy 303 for discriminatory reasons. To the contrary, the Board found that policy 303 and it predecessors were in existence long before the Cadillac project began and there was no evidence that policy 303 was formulated in order to avoid hiring individuals with union associations. The Board also noted that although the practical effect of policy 303 would be that the former employees and applicants referred by Zurn's current managers, supervisors and employees would tend not to be union supporters since Zurn is a nonunion employer, this circumstance would not necessarily blacklist union supporters or lead to a nonunion workforce. The Board noted, in fact, that Zurn had hired through MESC's normal referral process 33 lower priority applicants (individuals with appropriate work experience but without prior employee status or referrals), 15 of whom had union backgrounds, for openings in the trades the Union sought to organize. The Board also found that the actual operation of policy 303 resulted in the hiring of 17 union supporters, or approximately 10% of the 169 priority hires, in the relevant categories. The Board stated that although the ALJ had discounted these hires as mainly occurring prior to the onset of the Union's organizing campaign in June, the fact that these hires occurred at all indicated that "the hiring policy *itself* did not constitute such an impermeable barrier to union applicants as to be inherently discriminatory." The Board concluded,

> Because we find policy 303 to be facially lawful, not implemented for discriminatory reasons, and not inherently discriminatory against union applicants, we shall not order that it be rescinded.

6

The Board further determined that the General Counsel had established that Zurn harbored anti-union animus that contributed to its decision not to hire the union applicants in 23 instances, either by hiring nonunion applicants who lacked any priority under policy 303 or by failing to hire union applicants who should have been afforded preference in hiring. The Board determined that Zurn violated § 8(a)(1) and (3), which makes it unlawful for an employer to refuse to hire applicants because of their union status, on those occasions.

The Board determined, however, that the incidents where Zurn departed from policy 303 were not sufficient to establish that the entire policy was being used to avoid hiring union applicants. The Board determined that the evidence indicated that Zurn generally followed policy 303's priority criteria in hiring, having failed to follow the priorities set forth in the policy in only 23 of the 169 hiring decisions made other than through MESC's normal processes. The Board reiterated that policy 303 on its face does not discriminate on the basis of union membership or affiliation, and its stated hiring priorities are rationally related to the goal of hiring a competent, reliable work force. The Board stated:

> [O]nly when the Respondent deviated from the hiring policy was its conduct motivated by union animus. Consequently, we reverse the judge insofar as he found that the Respondent violated Section 8(a)(3) even when it hired applicants pursuant to the priority categories as laid out in policy 303.

The Board noted that where the policy itself is lawful, the General Counsel must show individual discriminatory deviations in order to prove violations. The Board cited as an exception to this principle a case where the discriminatory deviations are so massive that one can infer that the entire process is unlawfully motivated, as was the situation in *Fluor Daniel, Inc*., 333 NLRB 427 (2001), *enforced*, 332 F.3d 961 (6th Cir. 2003). The Board asserted that in *Fluor Daniel*, the

7

conclusion that the employer's entire hiring system was infected with union animus was warranted because the total number of deviations from the facially neutral stated hiring protocols (3,892) was actually greater than the total number of employees hired at the two job sites in question.

The Board went on to examine the facts surrounding the refusal to hire five individual applicants in this case – Sean Redner, Tony Perez, Gerald Richard, Lori Custer, and Joe Van Dyke. The Board determined that Zurn's conduct concerning these individuals indicated an anti-union motivation and that Zurn had failed to show it would have refused to hire them even in the absence of their union affiliations.

The Board rejected the Union's allegations that Zurn had violated § 8(a)(3) by refusing to consider the union applicants in addition to refusing to hire them. The Board found there was no evidence that any union applicants were denied the opportunity to register with MESC and to be considered along with nonunion applicants for positions with Zurn. The Board found that in those instances where Zurn had discriminated in hiring against union applicants, there was no basis for concluding that those applicants had been excluded from Zurn's hiring process altogether.

After having determined that Zurn engaged in certain unfair labor practices, the Board ordered Zurn to cease and desist and to take certain affirmative action necessary to effectuate the policies of the Act. Specifically, the Board ordered Zurn to do the following: (1) offer reinstatement to the members of the pipefitting crew who Zurn had unlawfully laid off; (2) offer employment to the union applicants Zurn would have hired but for its unlawful discriminatory practices; (3) offer James Bragan, Custer and Perez instatement to the positions they were initially offered and backpay based on what they would have earned in those positions; (4) offer Redner, Richard and Van Dyke instatement to the positions for which they applied and appropriate backpay; (5) place the remaining

discriminatees in the positions they would have filled absent the discrimination, consider them for future openings in accord with nondiscriminatory criteria, and notify them, the Union, and the Regional Director of future openings in positions for which the discriminatees applied or substantially equivalent positions; and (6) make the discriminatees whole for any lost earnings plus interest. The Board determined that under the circumstances of the case, and especially the length of time since the completion of the project, it would not apply the presumption of continued employment in the construction industry such as that applied in *Dean Gen'l Contractors,* 285 NLRB 573 (1987). Instead, the Board determined to match each discriminatee to a hired applicant and then track each slot as it actually provided employment.

After the Board issued its decision, Zurn stipulated that it would comply with the Board's Order. The Union filed this appeal, claiming that the Board erred in determining that anti-union animus did not infect all of Zurn's hiring decisions; in not finding policy 303 to be inherently destructive of the NLRA; in failing to grant a "refusal to consider" remedy; in failing to apply the presumption of continued employment to the discriminatees in this case; and in issuing a remedy that is not consistent with the Board's findings.

### III. Standard of Review

The court reviews the factual findings of the Board to determine if they are "supported by substantial evidence on the record considered as a whole." *Fluor Daniel, Inc. v. NLRB*, 332 F.3d 961, 967 (6th Cir. 2004) (citing *W.F. Bolin Co. v. NLRB*, 70 F.3d. 863, 870 (6th Cir. 1995)). The Board's underlying findings of fact are "conclusive" if they are supported by substantial evidence. 29 U.S.C. § 160(e). The court likewise reviews the Board's application of the law to the facts under the substantial evidence standard. *Id.* (citing *FiveCAP, Inc. v. NLRB*, 294 F.3d 768, 776 (6th Cir. 2002)).

9

The court may not overturn the Board's reasonable inferences, even if it would have reached a different conclusion. *Id.*

A finding by the Board that no unfair labor practice occurred and the Board's dismissal of an unfair labor practice complaint "must be upheld unless it has no rational basis" or is "unsupported by substantial evidence." *United Paperworkers Int'l Union v. NLRB*, 981 F.2d 861, 865 (6th Cir. 1992) (quoting *United Mine Workers of America, Dist. 31 v. NLRB*, 879 F.2d 939, 942 (D.C. Cir. 1989). The court accepts the Board's credibility determinations unless they have "no rational basis." *Fluor Daniel*, 332 F.3d at 967 (citing *NLRB v. Valley Plaza, Inc.*, 715 F.2d 237, 242 (6th Cir. 1983)).

## IV. Analysis

### A. The Board's finding that anti-union animus did not affect all of Zurn's hiring decisions is supported by substantial evidence

Section 7 of the NLRA, 29 U.S.C. § 157, grants employees the "right to . . . form, join, or assist labor organizations . . . ." Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise" of their § 7 rights. Section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3), makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment . . . to . . . discourage membership in any labor organization[.]" Thus, an employer violates § 8(a)(1) and (3) of the Act by refusing to hire applicants because of their union status.

The General Counsel for the Board bears the burden of proof in a refusal-to-hire case to show "(1) that the respondent was hiring, or had concrete plans to hire, at the time of the alleged unlawful conduct; (2) that the applicants had experience or training relevant to the announced or generally known requirements of the positions for hire, or in the alternative, that the employer has not adhered

10

uniformly to such requirements, or that the requirements were themselves pretextual or were applied as a pretext for discrimination; and (3) that antiunion animus contributed to the decision not to hire the applicants." *Fluor Daniel*, 332 F.3d at 968 (citing *FES*, 331 NLRB 9). The burden then shifts to the respondent to show that it would not have hired the applicants even in the absence of their union activity or affiliation. *Id.*

The Union claims that the Board erred in ruling that Zurn acted with anti-union animus in refusing to hire only some of the union applicants and in determining that anti-union animus did not infect all of Zurn's hiring decisions. The Union specifically contends that the Board erred in distinguishing *Fluor Daniel*, wherein the Board reached the opposite result, on the ground that the deviations in this case were *de minimis*. The Union argues that 23 deviations out of 202 hires cannot be deemed "isolated," "marginal" or "anomalous" so as to allow Zurn to "escape a finding of pretext that invalidates [policy 303] as a defense even to those decisions that appear to conform to it." The Union also claims that the Board counted the deviations in a different manner here than it did in *Fluor Daniel*. The Union argues that if the Board had counted the deviations in a consistent manner, the number of deviations from policy 303 would have exceeded the number of actual hires. The Union further contends that the Board erred in calculating the number of deviations and, specifically, by reducing the number of unqualified hires as determined by the ALJ from 70 to 11, because the Board failed to count all inexperienced applicants hired by Zurn as deviations. First, the Union claims that the Board's exclusion of three inexperienced hires based on the fact that they were hired in April or May of 1992, before Zurn began using policy 303 in early June to avoid hiring union applicants, is unfounded because the Board failed to consider that the Union's organizing campaign began as early as January of 1992. Second, the Union claims that the Board erred when it discounted the remaining

11

hiring deviations in favor of unqualified hires on the ground that nearly half of them were hired into helper positions for which "pertinent craft experience would seem to be less crucial." The Union alleges there was no evidence to support this speculation by the Board, and its reasoning runs counter to Zurn's assertion that policy 303 was "designed to select the most qualified applicant for the job opening."

The Union further argues that because the Board determined that the ALJ had failed to make particularized findings in support of his ruling that there were at least 70 nonunion applicants hired who had little or no experience in their job categories, the Board should have remanded the case to the ALJ to make particularized findings instead of discrediting the ALJ's findings. In an attempt to demonstrate the Board's error in failing to do so, the Union cites examples of individuals hired by Zurn who allegedly had little or no qualifications for the positions for which they were hired. The Union also claims that the Board failed to count all of Zurn's falsifications of applications as deviations from the hiring policy. The Union claims that these deviations are not only independent evidence of anti-union animus, but they constitute sufficient independent evidence that Zurn manipulated its hiring policy to discriminate in a wholesale manner against all union applicants. The Union contends that although the ALJ found that Zurn had altered the applications of six non-union applicants to indicate they had been referred to the job so as to have higher priority over union applicants, and the ALJ further found that the parties had stipulated that 12 additional applications were falsified to show referrals that never occurred, the Board found, without justification, that Zurn deviated from policy 303 by falsely altering only three applications. The Union argues that even assuming there were only three falsifications as the Board found, this is sufficient to show anti-union animus because lying must carry more weight than other types of deviations.

12

The Union also argues that the Board's conclusion that Zurn hired a substantial number of union supporters is not supported by the evidence. The Union alleges that the Board relied on evidence that was not reliable and that should not have been admitted and credited by the Board in making this determination. The Union argues that, in actuality, only 9.4% of the 202 individuals hired for the Cadillac project had any indicia of union backgrounds and only 11% of the previous employers listed on the applications of those hired were union.

In response, the Board contends that the Union failed to show that Zurn devised or implemented policy 303 to avoid hiring union applicants. The Board contends that the evidence shows that Zurn has a history of carrying a mobile work force with it throughout the country from one job to the next; Zurn regularly rehired current and former employees and referrals to work on new projects; Zurn had a hiring policy that gave preference to former employees and to referrals in effect since at least the late 1980's; Zurn hired some 50 employees with union backgrounds; and Zurn failed to hire many non-union applicants. The Board claims that the court lacks jurisdiction to consider the Union's arguments regarding the admissibility of evidence because the Union never argued before the Board that the ALJ erred in admitting the exhibits that it now questions and it never filed a motion for reconsideration from the Board's decision.

The Board also argues that it was justified in reducing the number of unqualified hires from 70 to 11 because (1) the ALJ named only 14 allegedly unqualified hires and failed to make specific findings regarding the circumstances surrounding all 70 hires, and (2) discounting three of the pre-June hires was consistent with the Union's theory that Zurn discriminated following Union organizing efforts that began in June 1992. The Board also claims the Union failed to preserve for appellate review its argument that the Board should have remanded the case to the ALJ for particularized

13

findings on the number of unqualified personnel hired because it could have filed a motion to reconsider after the Board issued its decision. The Board further argues that the Union has dramatically undercounted the number of hires with union backgrounds and has incorrectly identified other individuals as lacking the qualifications necessary for the jobs for which they were hired.

A review of the record as a whole discloses that the Board's factual findings and its conclusions are supported by substantial evidence. The Board properly considered exhibits that the ALJ had received into evidence regarding the categorization of individuals as having union status. The Union has not shown that the Board's decisions to credit the evidence before it concerning applicants' union affiliations, to determine the number of individuals with union affiliations in the manner it did, and to accord the evidence the weight the Board believed it deserved were irrational and are not entitled to deference. The Board could reasonably conclude based on the evidence of record that Zurn hired a substantial number of individuals with union affiliations and that anti-union animus did not contribute to the decision to not hire all of the applicants Zurn failed to hire.

The evidence did not compel the Board to reach the same result it reached in *Fluor Daniel*. The Union's argument to the contrary is based on the premise that the number of deviations from the hiring policy in this case, if counted in a manner consistent with the method used in *Fluor Daniel*, are so massive that they exceed the total number of employees hired. Initially, we note that the Union does not in fact seek to count the deviations in this case in a manner consistent with that employed in *Fluor Daniel*. In *Fluor Daniel*, the Board apparently calculated the number of deviations from the hiring policy at issue by counting the number of deviations from all hiring protocols for each applicant. Here, the Union argues that the Board should have calculated the number of deviations by counting each qualified union applicant that Zurn failed to hire for every non-union individual hired.

14

The two numbers yielded by these different calculations do not provide a proper basis for comparison. In any event, the Board's failure to reach the same result here that it reached in *Fluor Daniel* does not undermine its decision. The Board was free to calculate deviations in whatever manner it chose, so long as its calculation had a rational basis and was supported by substantial evidence. The Union has not shown that the Board's manner of calculating deviations was either irrational or unsupported by substantial evidence. The number of deviations found by the Board was not so massive that the Board was compelled to reach the same result it reached in *Fluor Daniel* and to conclude that a failure to hire all applicants with some type of union affiliation was the result of anti-union animus.

**B. The Board's determination that policy 303 is not illegal per se is supported by substantial evidence**

Some conduct has been held to be "so 'inherently destructive of employee interests' that it may be deemed proscribed without need for proof of an underlying improper motive." *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 33 (1967) (citations omitted). "That is, some conduct carries with it 'unavoidable consequences which the employer not only foresaw but which he must have intended' and thus bears 'its own indicia of intent.'" *Id.* (quoting *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 228, 231 (1963). "Inherently destructive conduct is that conduct which has 'far reaching effects which would hinder future bargaining,' i.e., that conduct which 'creat[es] visible and continuing obstacles to the future exercise of employee rights.'" *NLRB v. Centra, Inc.*, 954 F.2d 366, 373 (6th Cir. 1992) (citing *Esmark, Inc. v. NLRB*, 887 F.2d 739, 748 (7th Cir. 1989) (quoting *Portland Willamette Co. v. NLRB*, 534 F.2d 1331, 1334 (9th Cir. 1976))). The two types of inherently destructive conduct are "actions distinguishing among workers based on participation (or lack of participation) in a protected activity, and those acts which . . . discourage collective bargaining by

15

making it appear as a futile exercise in the eyes of employees. *Id*. (citing *Esmark*, 887 F.2d at 748-49).

If the conduct in question is deemed "inherently destructive," the employer "has the burden of explaining away, justifying or characterizing 'his actions as something different than they appear on their face,' and if he fails, 'an unfair labor practice charge is made out.'" *Great Dane Trailers*, 388 U.S. at 33 (citing *Erie Resistor*, 373 U.S. at 228). If the employer satisfies its burden, "the Board may nevertheless draw an inference of improper motive from the conduct itself and exercise its duty to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy." *Id.* at 33-34 (citing *Erie Resistor*, 373 U.S. at 229). "On the other hand, when 'the resulting harm to employee rights is comparatively slight, and a substantial and legitimate business end is served, the employers' conduct is prima facie lawful,' and an affirmative showing of improper motivation must be made." *Id.* at 34 (citing *NLRB v. Brown*, 380 U.S. 278, 289 (1965) and *Am. Ship Building Co. v. NLRB*, 380 U.S. 300, 311-313 (1965)).

The Union argues that policy 303 is illegal per se or inherently destructive of the NLRA. The Union claims that Zurn's hiring protocols created a dual system under which non-preferred job seekers seldom completed the application process or, if they did, were turned down, whereas preferred workers, who were unlikely to be proponents of unionization, were virtually guaranteed employment and sailed through the application stage with direct assistance from Zurn. The Union asserts that after studying the hiring and recruiting protocols used for its Cadillac project, Zurn's own expert witness testified that those mechanisms would be expected to result in a workforce dominated by employees with nonunion backgrounds.

In response, the Board alleges that the Union abandoned its claim that policy 303 is

16

"inherently destructive" of the Act by expressly asserting before the ALJ that it was not alleging that the policy is "illegal per se." Addressing the merits of the claim, the Board contends that it had a rational basis for finding that policy 303 is not "inherently destructive." The Board claims that the policy says nothing on its face about union membership and therefore does not, on its face, preclude or limit the possibilities for consideration of applicants with union preferences or backgrounds. The Board further argues that an employer is entitled to rely on a priority hiring policy as a legitimate, nondiscriminatory reason to not hire an applicant, so it follows that such a policy cannot be inherently discriminatory. The Board also contends that it offered a rational explanation for how current and former employees and referred applicants would tend to not be union supporters, but would not necessarily be blacklisted. The Board further argues that the Union's suggestion that the hiring policy perpetuated a work force that is the product of prior unlawful discrimination is not well-taken because the Union failed to show that Zurn engaged in widescale discrimination against labor unions prior to the Cadillac project.[1]

The Board addressed in its decision the Union's claim that policy 303 is illegal per se. The Union is therefore not barred from pursuing its claim that policy 303 is inherently destructive of the Act. The Union nonetheless cannot prevail under this theory because it has not offered sufficient evidence in support of its claim. To establish its claim, the Union relies on the preferences that the hiring system afforded candidates who had prior experience with Zurn or recommendations from supervisory personnel with non-union work backgrounds, and on the testimony of Zurn's expert witness, Dr. Ephraim Asher, that he would expect Zurn's priority system to "definitely" produce a

---

[1]Zurn disputes the Union's contention that its projects prior to the Cadillac project had never been union operations and contends that one earlier project, the Pedricktown project, was in fact a union project.

17

nonunion workforce. The Union contends that Dr. Asher's admission constitutes evidence that "the consequences of [Zurn's] priority hiring system are so obvious that no evidence of motivation needs to be presented." Evidence that a hiring policy of this nature would result in a nonunion workforce, however, falls far short of the type of conduct that would qualify as "inherently destructive" of employee rights. The evidence offered by the Union is not sufficient to eliminate the need to establish an improper motive and permit the court to overturn the Board's conclusion that policy 303 is lawful, the policy was rationally related to the goal of hiring a competent, reliable work force, and the entire hiring process was not motivated by an anti-union animus, even though Zurn deviated from the policy in a discrete number of instances.

## C. The Board did not err in fashioning a remedy

The Union contends that Zurn was both actively recruiting and hiring employees for the Cadillac jobsite, so that the blatant exclusion of union members and supporters from the hiring process entitles those individuals for whom there were no job openings at the time of trial to a "refusal to consider" remedy. The Union apparently believes that the individuals for whom there were no job openings at the time of trial are entitled to a determination of whether other jobs subsequently opened for which they would have been selected absent the employer's unlawful animus. The Union relies on the decision in *FES* wherein the Board held that (1) if a job opening follows on the heels of a refusal to consider an applicant for positions of that kind, the question of whether the applicant would have been offered the job had he been given nondiscriminatory consideration at the outset is a remedial issue appropriately determined at the compliance stage, and (2) if the General Counsel makes the required showing, then the job must be offered to that applicant as a necessary part of the make-whole remedy. The Board counters that the Union is not entitled to

18

a "refusal to consider" remedy because the Board dismissed the allegations that Zurn refused to consider union applicants for hire as having no merit.

The Board's position is well-taken. The Board determined that General Counsel had failed to prove that Zurn excluded the union applicants from the hiring process, and the Board therefore dismissed the allegation that union applicants were excluded from the hiring process altogether. The Union has not shown that the Board erred in making this determination. It follows that the Board did not err in failing to grant a remedy for an alleged refusal to consider union applicants for hire.

The Union also argues that the Board erred in refusing to apply the presumption of continued employment because it departed from its established policy without explicitly announcing the change in policy and its reasons for the departure. The Board stated that it was declining to apply the presumption in light of the circumstances of the case, and especially the length of time that had elapsed since completion of the Cadillac project. The Board did not err in this regard. The unusually lengthy period of time between the unfair labor practices and the formulation of a remedy is a sufficient basis in and of itself for declining to apply the presumption of continued employment. Moreover, the Board formulated a reasonable alternative for making the wronged individuals whole. Its decision to proceed in the manner it did is entitled to deference under § 10(c) of the Act, 29 U.S.C. § 160(c), which provides that in the event a violation of the Act is found, the Board is charged with the responsibility of devising remedies to effectuate the policies of the Act. The court will not disturb the Board's order, which the Union has failed to show is "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *See NLRB v. Overseas Motors, Inc.*, 818 F.2d 517, 520 (6th Cir. 1987) (quoting *Virginia Elec. & Power Co. v. NLRB*, 319 U.S. 533, 540 (1943)).

19

The Union further claims that the Board erroneously failed to include three discriminatees in its amended remedy or proposed order and to include one individual on the list of applicants discriminated against by departures from policy 303. The Union claims that the court should issue an order instating these four individuals and making them whole for Zurn's discrimination. The Board has represented in its brief that it will consider the three discriminatees at the compliance stage and nothing in its order precludes it from considering at the compliance stage the individual allegedly omitted from the list of applicants. Based on the Board's representation, the court need not address these alleged omissions.

## V. Conclusion

For all of the reasons set forth above, the decision of the Board is supported by substantial evidence. The petition for review is **DENIED**.