# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 17, 2013

No. 10-60822

Lyle W. Cayce
Clerk

INDEPENDENT ELECTRICAL CONTRACTORS OF HOUSTON, INCORPORATED,

Petitioner – Cross-Respondent

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent – Cross-Petitioner

Petitions for Review for Enforcement
of Orders of the National Labor Relations Board

Before JONES, WIENER, and GRAVES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

A trade group representing over a hundred electrical contractors, Independent Electrical Contractors of Houston ("IEC-Houston"), petitions for review of two National Labor Relations Board orders dated August 27 and September 30, 2010. NLRB cross-petitions for enforcement of the August 27, 2010 order. Because we conclude that the Board denied IEC-Houston due process of law and misapplied its own precedents, we grant the petition for review and deny the Board's cross-petition for enforcement.

No. 10-60822

## BACKGROUND

This opinion seeks to end more than a decade of uncertainty for IEC-Houston.  Commencing in 1996 and 1997, the International Brotherhood of Electrical Workers ("IBEW"), Local Union No. 716, brought multiple unfair labor practice charges against IEC-Houston and various of its contractor members.  *See KenMor Elec. Co.*, 355 N.L.R.B. No. 173, 2010 WL 3463868, at *34 (Aug. 27, 2010).[1]  The General Counsel issued a complaint based on the union's allegations on October 3, 1997.  *Id.*  Further charges were brought against Correct Electrical and IEC-Houston in an overlapping case presenting almost the same facts.  *See Indep. Elec. Contractors of Houston, Inc.*, 355 N.L.R.B. No. 225, 2010 WL 3864537 (Sept. 30, 2010).  Each complaint alleged that IEC-Houston's member employment-assistance programs discriminated against the hiring of union members and "salts" in violation of Sec. 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3).

As a loose trade association and an affiliate of a national organization, IEC-Houston has provided services to member contractors in the Houston, Texas area for several decades.  It operated during the period covered by these charges (1996–97 and 1997–99, respectively) on a very modest budget with four full-time employees, two of whom were clerical workers.  In addition to its training programs, lobbying, trade shows, and social functions, IEC-Houston offered two

---

[1] *Houston Stafford Electric, Inc.*, Case 16-CA-17894, 1998 WL 1985190, at *1 (N.L.R.B. Div. of Judges Sept. 29, 1998), was the original ALJ opinion which was later supplemented by *Houston Stafford Electric, Inc.*, Case 16-CA-17894, 2001 WL 1603849 (N.L.R.B. Div. of Judges Mar. 21, 2001).  Upon review, the NLRB also found that IEC committed similar unfair labor practices in *KenMor Electric Co.*, 355 N.L.R.B. No. 173, 2010 WL 3463868 (Aug. 27, 2010).

No. 10-60822

employment services to the members.  These services were the focus of unfair labor charges.

**The Shared Man Program**

Since 1955, IEC-Houston has run a program that enables member contractors who need additional electricians to borrow workers for up to sixty days from other IEC-Houston contractors who have less work.  In 1989, the program was formalized in writing.  It provides several benefits: the borrowing contractor gains access to trained, reliable help; the lending contractor avoids paying unemployment benefits; and the employee electricians avoid breaks in employment. IEC-Houston kept no records about the utilization of this program.

In a case concerning an IEC-Houston member, the Board held that the shared man program did not discriminate against union supporters in violation of § 8(a)(3).  *Pollock Elec., Inc.*, 349 N.L.R.B. 708, 710 (2007).  The Board's opinion reaffirms it had "repeatedly found that hiring policies that give priority to former employees and recommended employees are not unlawful, even if the effect of such policies is to limit or exclude union applicants."  *Id.*[2]  *Pollock* squarely rejected the administrative law judge's finding of discrimination in the shared man program.  Further, in another case involving an IEC member, the Board upheld the IEC shared man program.  *Centex Indep. Elec. Contractors*

---

[2] This proposition is well supported by NLRB precedent.  *See, e.g.*, *Zurn/N.E.P.C.O.*, 345 N.L.R.B. 12, 15 (2005), *petition for review denied*, 243 F. App'x 898 (6th Cir. 2007); *Centex Indep. Elec. Contractors Ass'n*, 344 N.L.R.B. 1393, 1398 (2005) (employer's preference for "borrowed employees" lawful); *Brandt Constr. Co.*, 336 N.L.R.B. 733, 733–34 (2001), *review denied sub nom. Int'l Union of Operating Eng'rs Local 150 v. NLRB*, 325 F.3d 818, 833–34 (7th Cir. 2003) (preference for known over unknown is lawful); *In re Kanawha Stone Co.*, 334 N.L.R.B. 235, 236 (2001) (preference for employees on lay off, former employees, and referrals from existing employees lawful); *Belfance Elec., Inc.*, 319 N.L.R.B. 945, 946 (1995) (preference for known over unknown is lawful).

No. 10-60822

*Ass'n*, 344 N.L.R.B. 1393, 1403 (2005) (employer's preference for borrowed employees lawful).

**Application Referral Service**

In 1990, years before the union salting campaign that precipitated the instant charges, IEC-Houston instituted an application referral service for members; its purpose is to save them the time and expense of running employment ads and dealing with staffing agencies. During the period covered by these charges, electricians looking for work could fill out a five-page application at the offices of IEC-Houston. The clerical staff would ensure the application was complete and then identify the worker as "green" (inexperienced), an apprentice, or a journeyman. The applications were filed according to these levels and were placed in an active file for thirty days. Thereafter, all applications were maintained in a file cabinet for a year. An applicant thus had to fill out a new application each thirty days in order to remain in the active file. However, since many employers using the service only wanted to see applications that were up to a few days old, it became common for applicants to refile their applications more frequently than once a month. About 15–20 applications were filed each day.

Initially, IEC-Houston did not charge the applicant for this service. In 1997, the association realized that the referral service's cost ($60,000 to $100,000 annually) was becoming too high. On September 9, it began charging applicants $50 for each additional application filed within a thirty-day period. The fee was waived for electricians who had recently been laid off by an IEC-Houston member.

4

No. 10-60822

When a member asked to review the applications, they would be made available for in-person review or by fax according to the skill level and recency requested. It is undisputed that IEC-Houston sent all the applications on file to any member as requested. No applications were withheld or modified based on an applicant's union affiliation. IEC-Houston hired no electricians itself, but acted only as a conduit to the members, who each made independent hiring decisions. Because of its tiny staff, IEC-Houston kept no records showing which applications went to which recipients, nor did it inform applicants where their applications had been sent.

**IEC-Houston Newsletters**

Two newsletters are material to this case, as the Board held them relevant to labor law violations. IEC-Houston urged its free speech rights consistent with NLRA § 8(c). We summarize the articles as background information but do not consider the legal issues surrounding them.

In March 1994, the IEC-Houston newsletter contained an article entitled "IEC members can defeat COMET,"[3] written by National IEC First Vice President Jon Pollock. This article described a tactic whereby union salts (union organizers) would intentionally induce employers to fire covert salts and then file NLRB charges. The resulting legal expenses for contractors were often devastating. Pollock warned that advertising for electricians directly in the newspapers was "equivalent to waving a red flag to the union." Moreover, he opined, "when a stranger shows up looking for work, we are not allowed to ask

---

[3] COMET is an acronym for "Construction, Organizing, Membership, Education, and Training" which was implemented by the IBEW in 1993 to advance unionization among IEC's members.

No. 10-60822

'are you here to work or are you here to destroy us?' Unknown workers may come with hidden motivations and questionable agendas."

To defend against "this union attack," Pollock advocated the use of IEC services, such as the application referral service and shared man program, to "minimize their exposure to risks." He pointed out that "[m]any IEC chapters advertise for electrician applications on behalf of [their] members," and that this system allowed the contractors to avoid some problems of "hiring off the street." "[C]ontractors who are short handed can obtain a fax list of potential applicants, and they select from it those who have the best credentials."

In the March 1996 newsletter, IEC-Houston published an article entitled "Coping with Labor's COMET Campaign," written by Peter Cockshaw, of *"COCKSHAW'S Construction Labor News and Opinion."* Cockshaw observed that after the *Town & Country Electric*[4] decision, non-union contractors were "scrambling for strategies to counter new and accelerated union organizing attacks." He opined that, "[c]urrently, the best bet for some anti-'salting' relief is the program run by IEC's Houston Chapter."

Bob Wilkinson, the president of IEC-Houston, is quoted—inaccurately[5]—as saying that: "IBEW locals in this area and many others monitor all ads and then send union members to apply." Cockshaw states that "[t]o counter labor's attack on the open shop's skills' sources, the Houston Chapter and some other IEC affiliates have developed referral procedures. They advertise on behalf of their members and sign up applicants at various offices."

---

[4] *NLRB v. Town & Country Elec., Inc.*, 516 U.S. 85, 116 S. Ct. 450 (1995).

[5] While the article purportedly contains several quotes by Bob Wilkinson concerning IEC-Houston's application service and shared man program, most of the "quotes" are verbatim excerpts from the statements made by Jon Pollock in the March 1994 newsletter.

No. 10-60822

Wilkinson described the program: "Contractors who are short-handed can obtain a fax list of potential applications.  They then select those who have the best credentials.  Aside from helping to avoid potential 'salting' problems, this process eliminates duplication of effort among member firms."  Finally, Wilkinson reaffirmed that IEC's programs were created long before the COMET Program, but stated that even though "it was created for other reasons, this arrangement minimizes our members' exposure to the current 'salting' risk."  Wilkinson concluded that charges brought by the IBEW against the IEC's programs do not bother him "because [he] realizes that business agents who filed the complaints are just doing their jobs."

**The *KenMor* Decision**

The first unfair labor practices complaint alleged violations of § 8(a)(3) and derivative violations of § 8(a)(1): that the respondents refused to hire or consider hiring various applicants because of their union affiliations and participation in protected activities.  Moreover, the complaint alleged that IEC-Houston maintained a referral system that discriminated against the hiring of union-affiliated employees. *KenMor*, 2010 WL 3463868, at *34.

After a hearing in 1998, the Administrative Law Judge (ALJ) found that "several of I.E.C.'s practices tend to exclude Union members from consideration for employment, and are therefore unlawful" under "8(a)(3) and (1)"[6] of the NLRA. *Houston Stafford Elec., Inc.*, Case 16-CA-17894, 1998 WL 1985190, at

---

[6] Violations of § 8(a)(3) are often derivative violations of § 8(a)(1), and the phrasing "8(a)(3) and (1)" is common to indicate a derivative violation. *Metro. Edison Co. v. NLRB*, 460 U.S. 693, 698 n.4, 103 S. Ct. 1467, 1471 n.4 (1983).  Freestanding and independent violations of § 8(a)(1) are established through a different doctrinal test, *see id.*  No independent § 8(a)(1) violation was alleged in the charge.

No. 10-60822

*13, 19 (N.L.R.B. Div. of Judges Sept. 29, 1998). The ALJ found that because all of IEC-Houston's members were non-union, the shared man program would exclude almost all union workers from the program and that the program was inherently discriminatory. *Id.* at *14.[7] Next, the ALJ found that the $50 fee for additional applications was inherently discriminatory because union members had to pay, but the fee was not charged to workers recently laid off by IEC-Houston's non-union members. *Id.* at *14–15. Moreover, the ALJ found discriminatory IEC-Houston's refusal to tell applicants to whom their applications were distributed. *Id.* at *15.[8] Rejecting the respondent's explanation of its practices, the ALJ held that the applicants were "trapped in a system where [they] could not find out whether [their] application[s] had ever been considered," and that the system was thus unlawful. *Id.* Finally, the ALJ found that the two newsletter articles were "background evidence" of anti-union animus that supported the ALJ's § 8(a)(3) violation findings. IEC filed exceptions to the ALJ's decision. *Id.*

More than nine years later, after an intervening remand,[9] the Board finally ruled in *KenMor Electric Co.*, 2010 WL 3463868. The Board held that IEC's programs constituted unfair labor practices, but did not rely on "§ 8(a)(3) and (1)." Indeed, the Board did not adopt the findings of the ALJ concerning

---

[7] This ruling is foreclosed by a long line of NLRB precedent, *see* note 2 *supra*.

[8] The ALJ mentions that this violates § 8(a)(1), but then concludes the system is "a discriminatory hiring system," which is a § 8(a)(3) violation.

[9] On June 13, 2000, the NLRB remanded this case for further consideration in light of its decision in *FES*, 331 N.L.R.B. 9 (2000), *supplemented by* 333 N.L.R.B. 66 (2001), *enf'd* 301 F.3d 83 (3d Cir. 2002). On March 21, 2001, however, the ALJ issued a supplemental decision reaffirming the findings, conclusions, and recommended order in the original decision. *Houston Stafford Elec.*, 2001 WL 1603849. IEC again filed exceptions to the decision.

No. 10-60822

whether IEC, "which was not itself an employer of electricians, also violated Sec. 8(a)(3), or whether individual components of the application referral system were inherently discriminatory or independently unlawful." *Id.* at *5 n.15.

Instead, a majority of the NLRB panel found an independent § 8(a)(1) violation because the application referral program "interfered with the right of job applicants who were union members and 'salts' to be hired on an equal basis with other nonunion applicants." *Id.* at *1.[10] In reaching this conclusion, the majority found the two articles in IEC newsletters to be admissions of violations of rights to organize protected in NLRA § 7. *Id.* at *4–5. Next, the majority found that elements of the referral system "considered as a whole, tend[] to interfere with Section 7 activity by disadvantaging salts and union applicants." *Id.* at *5. In particular, the failure to keep records, the policy of not revealing to applicants which IEC-Houston members received their applications, the policy of not permitting applicants to review filed applications, the selectively-imposed $50 fee for additional applications, and members' practice of reviewing only recently filed applications all worked together to disadvantage union applicants. *Id.*[11]

Third, the majority found that the shared man program, while not unlawful in itself, tended, in tandem with the application referral service, to ensure that union applicants would not be hired by IEC members. *Id.* at *6.

_____

[10] Section 8(a)(1) makes it unlawful for an employer to "interfere with, restrain, or coerce employees in the exercise" of their § 7 rights.

[11] Despite the majority's belief that the referral service was opaque to applicants, the union members identified and charged nearly a dozen IEC-Houston members with discriminatory hiring practices because, they had found out, their own applications had been rejected by those companies. None of those violation findings is challenged on appeal, and all were unanimously upheld in *KenMor* and *Independent Electrical Contractors*.

No. 10-60822

Finally, the majority found that the referral service as a whole had a "coercive impact" because not one of the named union applicants was hired, while less qualified electricians were hired. *Id.* Based on these findings, the majority ruled that the IEC's programs violated § 8(a)(1) of the NLRA. *Id.* at *7.

A strong dissent was filed. The dissenting Board member charged that the majority's finding of a § 8(a)(1) violation was based upon a strict liability disparate impact theory that was impermissible under the NLRA and case law and drastically departed from any previously recognized theory of liability. *Id.* at *21, 24, 27 (Schaumber, Member, dissenting in part). The dissent also demonstrated that the majority's ruling went "well beyond" anything alleged in the complaint or argued by the General Counsel and, therefore, denied IEC-Houston due process of law. *Id.* at *24–25. The dissent would have upheld the program except for the reapplication fee.[12] *Id.* at *27–28.

**The *Independent Electrical Contractors* Decision**

The second NLRB opinion that the petitioner asks this court to review is *Independent Electrical Contractors of Houston, Inc.*, 2010 WL 3864537.[13] The

---

[12] The $50 fee, the dissent concluded, was commenced after the Union's salting campaign and had been proven discriminatory in violation of "§ 8(a)(3) and (1)" of the Act. *KenMor,* 2010 WL 3463868, at *29 (Schaumber, Member, dissenting in part).

[13] The dissent here argues that we lack jurisdiction to review the *Independent Electrical Contractors* decision because the NLRB dismissed the allegations concerning the referral system. The unusual procedural posture of this case leads us to reject that contention.

*Deaton Truck Line, Inc. v. NLRB*, 337 F.2d 697, 698 (5th Cir. 1964) supports the proposition that Section 10(f)—29 U.S.C. § 160(f)—limits the right to review to parties aggrieved by a final Board order and that an employer is not aggrieved if he objected only to findings and conclusions underlying a Board order dismissing a complaint, not to the order itself. Even so, this case is distinct from *Deaton Truck Line.* Here, the findings of liability in the *Independent Electrical Contractors* Order are germane to and a necessary part of the factual picture underlying the Board's one-month-earlier *KenMor* order. This fact was acknowledged by the NLRB when it stated that the two cases share the same operative facts

No. 10-60822

ALJ issued her opinion in the case on October 5, 2001 and the Board took nearly eight years to issue its decision.

The Board found that the issues of law "in the two cases [(*KenMor Electric Co.* and *Independent Electrical Contractors*)] are virtually identical, as was much of the material evidence." *Id.* at *1. The single noteworthy change in the referral service program was that IEC-Houston had stopped, after only six months, charging the $50 fee for additional applications within 30 days. *Id.* at *2. IEC-Houston had also begun to post applications online in addition to collecting hard copies for its members. *Id.* at *2 n.4. The majority noted that the IEC's services had already been held to violate § 8(a)(1) in *KenMor* and that an appropriate remedy had been ordered. *Id.* at *2. The majority dismissed the charges against IEC-Houston because any further remedy would be redundant.

Again, a strong dissent took issue with the Board majority's reasoning. The dissent agreed that the complaint against IEC-Houston should be dismissed, but on the ground that these programs did not violate § 8(a)(1). *Id.* at *5 (Hayes, Member, concurring in part and dissenting in part). The dissent argued that the

---

and involve the same actors. As the Board concluded, the *Independent Electrical Contractors* decision is simply a continuation of the *KenMor* decision (which order aggrieves IEC), rather than an independent decision. No statutory purpose would have been served in re-ordering the same violation. *Indep. Elec. Contractors of Houston, Inc.*, 355 N.L.R.B. No. 225, 2010 WL 3864537, at *2 (Sept. 30, 2010) ("A second finding combined with a second remedy would be entirely redundant."). We therefore consider them together.

This conclusion is strengthened by the fact that the NLRB performed no independent legal analysis in *Independent Electrical Contractors,* but merely incorporated the *KenMor* discussion. Additionally, it was the NLRB's Regional Director who consolidated for trial IEC-Houston and six independent contractors in what became the *KenMor* case and then consolidated IEC and several more contractor members for a second trial. The NLRB, having put IEC to the expense of two trials—with one result—should not escape now the consequences of that decision by a declaration that the evidence in the second trial is off-limits for review by this court.

No. 10-60822

*KenMor* majority created a new theory of liability in "an apparent attempt to circumvent both the lack of evidence of discriminatory motivation in the operation of the system and the legal barrier to disparate impact litigation under our Act." *Id.* The dissent pointed out that this theory was neither pled in the complaint, nor fully litigated. *Id.* Moreover, all the elements of the system, except the $50 fee, were clearly legal. *Id.* Finally, under the proper doctrinal test for finding a violation of § 8(a)(1), the majority expressly and erroneously refused to give any weight to IEC-Houston's business justifications for its policies. *Id.*

## DISCUSSION

The majority of this panel concludes that NLRB's stated rationale violates standards of due process. Before reaching the issue, however, it is necessary to respond to the dissent's view that we lack "jurisdiction" pursuant to § 10(e) of the NLRA.

### 1. Appellate Jurisdiction

The Union, as Intervenor, asserts that we lack jurisdiction to consider IEC-Houston's due process challenge because respondent failed to raise this issue before the Board. Section 10(e) states that "[n]o objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). *See NLRB v. Houston Bldg. Servs., Inc.*, 128 F.3d 860, 863 (5th Cir. 1997). The dissent subscribes to the Union's argument. There are several reasons to reject this argument.

First, it would be difficult to hold this requirement as "jurisdictional" in this court because the statute itself creates an exception. *See, e.g.*, *Reed Elsevier,*

No. 10-60822

*Inc. v. Muchnick*, 559 U.S. 154, 159–66, 130 S. Ct. 1237, 1243–47 (2010) (discussing difference between jurisdictional and non-jurisdictional rules). Following a recent Supreme Court precedent, § 10(e) is essentially an exhaustion of remedies provision and as such is properly raised as an affirmative defense. *Cf. Jones v. Bock*, 549 U.S. 199, 212–16, 127 S. Ct. 910, 919–21 (2007). It should follow that this court does not lack "jurisdiction" to consider the merits of an NLRB order if the Board itself chooses not to raise a § 10(e) exhaustion defense. This aspect of § 10(e) is for the benefit of the Board, not a sword for intervenors. Although we have previously held that § 10(e) is "mandatory, not discretionary," *Houston Bldg. Servs.*, 128 F.3d at 863, it was the Board in that case, not an intervenor, that raised the statute.

Second, while the case law generally supports the idea that a party must raise any issues to the Board before appealing them, this requirement can be measured in context. The purpose of § 10(e) is to give the Board notice and an opportunity to confront objections to its rulings before it defends them in court. *See, e.g.*, *Marshall Field & Co. v. NLRB*, 318 U.S. 253, 256, 63 S. Ct. 585, 586 (1943). In some cases, though, courts construing § 10(e) have concluded that "when the policies underlying the rule are not implicated," issues not directly raised to the Board may be considered on appeal. *Facet Enters., Inc. v. NLRB*, 907 F.2d 963, 970–74 (10th Cir. 1990). Addressing a due process challenge, *Facet* explicitly distinguished the two primary cases—*Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665–66 (1982), and *International Ladies' Garment Workers' Union v. Quality Manufacturing Co.*, 420 U.S. 276, 281 n.3 (1975) (quoting 29 U.S.C. § 160(e))—where failure to petition the Board for reconsideration was fatal to an appeal. The request for reconsideration,

13

No. 10-60822

29 C.F.R. § 102.48(d)(1), was actually only necessary in those cases because the petitioners' objections had never been voiced to the Board at all. *Id.* at 971–72. Absent notice, it would have been inappropriate for the appellate court to review the issue. *See also Bath Marine Draftsmen's Ass'n v. NLRB*, 475 F.3d 14, 24 (1st Cir. 2007) (because the Board had adequate notice that the General Counsel (through an unclear brief) and the Unions believed they had posed an issue to the Board, it was preserved for appeal; lack of a motion for reconsideration was not fatal since the Board already understood the issue). Here, the Board's full consideration of the due process claim provides a context in which review is warranted.

Ultimately, because the statute carries its own qualification, courts have frequently, but carefully, applied the "extraordinary circumstances" exception. One case that articulates some of the grounds for not applying § 10(e) strictly, or for finding the exception, is *Local 900, Int'l. Union of Elec., Radio and Machine Workers v. NLRB*, 727 F.2d 1184 (DC Cir. 1984) ("*Local 900*"). In particular *Local 900* notes a futility exception where it would be an empty formality to require filing a motion to reconsider before the Board. *Id.* at 1191. The court there allowed the complainant to raise a retroactivity challenge to the Board's decision because the issue had been implicit in its briefing to the Board. *Id.* at 1194 (taking into account the *combination* of conditions present when considering the adequacy of the objection). And under a different set of facts, this court has also applied the extraordinary circumstances exception when futility was involved. *NLRB v. Robin Am.*, 667 F.2d 1170, 1171 (5th Cir. 1982).

In this case, it is appropriate to examine the due process issue based on the "extraordinary circumstances" before us. First, NLRB did not raise the

14

No. 10-60822

question of exhaustion. Second, eight and nine years elapsed between the ALJs' respective decisions and those of the Board. Surely, it was unnecessary for an aggrieved party to extend a process that had already gone on intolerably long; IEC had no reason to think that the Board would rule more expeditiously on a motion for rehearing than it had on the appeals in the first place. Third, questions of due process were raised, albeit not in this precise context, in IEC's objections to the ALJ findings, and the General Counsel acknowledged those questions. Fourth, five Board members participated in the two decisions and both panels discussed due process. Not only did the Board deny due process by relying here on a novel theory, it *preemptively* denied that it had denied due process. Any attempt by the IEC to add to the debate already undertaken by the Board would have been futile.

### 2. Due Process

Administrative due process, reflecting constitutional standards, requires that "[p]ersons entitled to notice of an agency hearing shall be timely informed of . . . (3) the matters of fact and law asserted." 5 U.S.C. § 554(b)(3). The NLRB is well acquainted with this requirement. IEC-Houston contends, however, and we agree, that it was deprived of due process of law[14] because it was charged and tried under § 8(a)(3), while each Board panel rejected the ALJs' finding of liability under § 8(a)(3), and instead found violations of § 8(a)(1) under a novel theory of liability. At trial in *KenMor*, the General Counsel described the theory of the case by stating that she would show that IEC's "hiring system is

---

[14] The dissents in *KenMor* and *Independent Electrical Contractors* agree that the NLRB deprived IEC of due process. *KenMor*, 2010 WL 3463868, at *24–25 (Schaumber, Member, dissenting in part); *Indep. Elect. Contractors*, 2010 WL 3864537, at *5 (Hayes, Member, concurring in part and dissenting in part).

discriminatory, and that it violates the Act, because it discriminates against Union organizers." There were no independent allegations of interference with employee rights under § 7. In his "Conclusions of Law," the ALJ in *KenMor* found IEC-Houston violated "§ 8(a)(3) and (1)" because its programs discriminated against union members. *Houston Stafford Elec.*, 1998 WL 1985190, at \*19. The same procedures occurred in *Independent Electrical Contractors*. In both cases, IEC-Houston restricted its defense to the accused § 8(a)(3) violations. The Board's change of liability theories on appeal was error and it was not harmless error.

In *In re Champion International Corp.*, 339 N.L.R.B. 672, 673 (2003), the Board stated that "[i]t is axiomatic that a respondent cannot fully and fairly litigate a matter unless it knows what the accusation is." Moreover, the Board knows that it cannot "change theories in midstream without giving respondents reasonable notice of the change." *Lamar Cent. Outdoor d/b/a Lamar Adver. of Hartford*, 343 N.L.R.B. 261, 265 (2004) (quoting *Bendix Corp. v. FTC*, 450 F.2d 534, 542 (6th Cir. 1971)). Importantly, the Board has recognized that when the General Counsel has chosen to litigate against a respondent on a narrow theory of liability, and the respondent was reasonably led to believe that it would not have to defend on a broader theory, an ALJ is not free to resolve the case on a broader theory. *In re Sierra Bullets, LLC*, 340 N.L.R.B. 242, 243 (2003) (citing *Paul Mueller, Co.*, 332 N.L.R.B. 1350 (2000)). In such a case, the proper response, according to *Sierra Bullets*, is to reverse the ALJ, reject the theory on a broader analysis, and dismiss the charge. *Id.* The First and Sixth Circuits have held likewise. *NLRB v. Fletcher Co.*, 298 F.2d 594, 600 (1st Cir. 1962); *NLRB v. Johnson*, 322 F.2d 216, 219–20 (6th Cir. 1963).

No. 10-60822

The Board responds by pointing to *Pergament United Sales, Inc.*, 296 N.L.R.B. 333, 334 (1989), *enf'd* 920 F.2d 130 (2d Cir. 1990), where the Board decided it could find an unalleged unfair labor practice that (1) is "closely connected to the subject matter of the complaint," and (2) "has been fully litigated." The problem with *Pergament*, and the related cases cited by the NLRB,[15] is that they extended the same operative facts of the charge to other, well-defined theories of violation. In *Pergament*, for instance, the common issue between the § 8(a)(3) violation charged and the § 8(a)(4) violation found was whether the employer refused to hire women because they belonged to a union. Here, in contrast, the Board applied a new and previously unrecognized theory[16] against which the accused party had no notice or opportunity to defend. *Pergament* and the other cases cited by the Board are distinguishable.

The adverse consequences of the Board's finding of a § 8(a)(1) violation arise as follows. First, applicants who are individually denied employment ordinarily proceed under § 8(a)(3), which covers "discrimination in regard to hire or tenure of employment." 29 U.S.C. § 158(a)(3). Section 8(a)(1), on the other hand, concerns interference with the rights of employees to organize pursuant to Section 7. 29 U.S.C. § 158(a)(1). As in this case, the General Counsel often charges employers with violating §§ 8(a)(3) and (1), which amounts to a primary violation of § 8(a)(3) and a derivative violation of § 8(a)(1). Violations of § 8(a)(3)

---

[15] *Casino Ready Mix, Inc. v. NLRB*, 321 F.3d 1190, 1200 (D.C. Cir. 2003) (quoting *Pergament United Sales, Inc.*, 296 N.L.R.B. 333, 334 (1989), *enf'd* 920 F.2d 130 (2d Cir. 1990)); *In re Cardinal Home Prods., Inc.*, 338 N.L.R.B. 1004, 1007 (2003) (same); *Williams Pipeline Co.*, 315 N.L.R.B. 630, 630 (1994) (same).

[16] *KenMor* is a new category of violation under § 8(a)(1) as evidenced by its own section in a leading labor law treatise. *See, e.g.*, 1 N. PETER LAREAU, LABOR AND EMPLOYMENT LAW § 5.07[8] (2012).

No. 10-60822

may separately violate § 8(a)(1) when "the employer's acts served to discourage union membership or activity." *Indiana & Michigan Elec. Co. v. NLRB*, 599 F.2d 227, 229 n.2 (7th Cir. 1979) (cited with approval in *Metro. Edison Co. v. NLRB*, 460 U.S. 693, 103 S. Ct. 1467 (1983)). The two provisions, however, "are not coterminous." *Metro. Edison*, 460 U.S. at 698 n.4, 103 S. Ct. at 1472 n.4. Moreover, a derivative violation of § 8(a)(1) stemming from a § 8(a)(3) charge will not be reviewed independently; only the §8(a)(3) charge will be considered. *Id.* For a § 8(a)(1) violation to be considered on its own merit, it must be independently charged. *Id.* The Board was not at liberty to ignore the distinction between § 8(a)(1) and (3).

Second, the nature of the violations requires different proof. Anti-union animus or discriminatory motive are essential proof for § 8(a)(3). *FES, a Div. of Thermo Power*, 331 N.L.R.B. 9, 12 (2000). For a violation of § 8(a)(1), however, an employer's motive is irrelevant. *KenMor*, 2010 WL 3463868, at *4. The totality of circumstances must be considered in determining whether employees' § 7 rights have been interfered with in violation of § 8(a)(1), but the Board must also allow an employer to demonstrate a legitimate and substantial business justification for its conduct. Under well settled precedent, the Board's duty is then to balance the asserted business justifications and the invasion of employees' rights in light of the Act and its policy. *California Newspapers P'ship, d/b/a ANG Newspapers*, 343 N.L.R.B. 564, 565 (2004) (citing *In re Desert Palace d/b/a Caesar's Palace*, 336 N.L.R.B. 271, 272 n.6 (2001); *Jeannette Corp.*, 532 F.2d 916, 918 (3rd Cir. 1976)). Whether IEC-Houston could have offered additional justifications for its practices, or disproved the alleged systemic disadvantage imposed on union applicants through its programs, is unknown

18

because respondent had no notice that this was necessary. Equally unfortunate, the Board, having deviated from the charges that had been pled and tried, then refused to expressly balance IEC-Houston's business justifications as required by *ANG*.

Further proof of the no-win situation in which the Board placed respondent is the Board's ambiguous approach to motive in finding a § 8(a)(1) violation. On one hand, the Board acknowledged the irrelevance of an adverse motive. On the other hand, it stacked the elements of the shared man program and application referral service, each of which has been upheld as legal by the Board or courts, and found them collectively unlawful *when viewed in light* of the allegedly anti-union newsletters. Even if this internally inconsistent theory had been timely asserted, the Respondent could not have known what kind of defense to pursue.

Finally, the novelty of the Board's theory of liability supports our conclusion that IEC-Houston lacked notice of the basis for § 8(a)(1) liability. We need not determine whether the Board's finding of a violation amounts to an impermissible disparate impact theory. *See Contractors' Labor Pool, Inc. v. NLRB*, 323 F.3d 1051, 1059 (D.C. Cir. 2003). For one thing, there was no evidence that IEC-Houston's processes applied differently to union and non-union applicants. But apart from that, the Board's opinion and briefs to this court are markedly short of citing any factually or legally related § 8(a)(1) precedents. We do not question the Board's authority to fashion novel remedies where novel facts show violations. Here, however, IEC-Houston's referral service predated the union's COMET program by several years and therefore must have lacked an anti-"salting" animus, while the shared man program is

No. 10-60822

longstanding and has been upheld by NLRB. The IEC-Houston services were neither the exclusive hiring resource of its member contractors nor their first resort, and the actual impact or utilization of the shared man program, during a period characterized by substantial demand, was not explored. If the General Counsel had chosen to pursue a novel § 8(a)(1) violation premised on these facts, it should have been done in the regular adjudicative process, and not as an after-thought imposed by the Board on review. *Cf. Zurn/N.E.P.C.O.*, 345 N.L.R.B. 12, 15 (2005), *pet. for review denied*, 243 F. App'x 898 (6th Cir. 2007) (where the Board found a program not discriminatory, despite a disparate impact on union-affiliated employees, because it was facially neutral and, crucial to the lack of discriminatory purpose, because the program was created before the union activity that led to charges).

Because this decision is predicated on due process grounds, we do not reach the merits of the Board's novel § 8(a)(1) theory of liability.

## CONCLUSION

The foregoing discussion renders unenforceable the Board's findings of an independent § 8(a)(1) violation against IEC-Houston.[17] Accordingly, the petition for review is **GRANTED** and the Board's cross-petition for enforcement is **DENIED**.

---

[17] Although the dissenters in both cases would have upheld the finding of a § 8(a)(3) violation concerning the $50 re-application fee, the Board majority specifically rejected the ALJs' findings of discriminatory animus in the imposition of the fee. We may not affirm an administrative agency action on a rationale that the agency refused to adopt. *SEC v. Chenery Corp.*, 318 U.S. 80, 93–94, 63 S. Ct. 454 (1943).

No. 10-60822

JAMES E. GRAVES, JR., Circuit Judge, dissenting:

I dissent from the majority's opinion and would deny the petition for review and grant the cross-petition for enforcement.

In enacting the National Labor Relations Act ("NLRA" or "Act"), Congress expressed an unequivocal intent:

> It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by *encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing*, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.

29 U.S.C. § 151 (emphasis added).

It is through this lens that we must view the case before us. Though it may seem, at first glance, counterintuitive that an employer is prohibited from discriminating against a union salt[1] who applies for a job with the express intention of organizing the workplace, Congress was clear that this activity is protected. *Id.*; *see also NLRB v. Town & Country Elec.*, 516 U.S. 85, 87, 90-92 (1995) (ruling that union salts are protected as "employees" under the NLRA). This is especially the case when, as here, the employers are organized into their own associations:

> The inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association substantially burdens and affects the

---

[1] "Salts" are union organizers that apply for work with the intention of encouraging coworkers to form a union.

No. 10-60822

flow of commerce, and tends to aggravate recurrent business depressions, by depressing wage rates and the purchasing power of wage earners in industry and by preventing the stabilization of competitive wage rates and working conditions within and between industries.

29 U.S.C. § 151.

It is my opinion that we lack jurisdiction to consider the National Labor Relations Board's ("NLRB" or "Board") order in *Indep. Elec. Contractors of Houston, Inc.*, 355 N.L.R.B. No. 225, 2010 WL 3864537 (Sept. 30, 2010) ("September Order"), as well as the merits of certain of IEC-Houston's arguments. Moreover, even if we could consider all of IEC-Houston's arguments, they fail on the merits. The NLRB's orders rest on substantial evidence and I would thus affirm.

A.     *Jurisdictional Issues & IEC-Houston's First Two Arguments*

1.     *We Lack Jurisdiction to Consider the September Order.*

Under 29 U.S.C. § 160(f), "[a]ny person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals[.]" The NLRB General Counsel contends that the September Order has no "adverse effect"[2] on IEC-Houston because it orders no relief with respect to IEC-Houston. Rather, in the September Order, the Board stated that in light of the relief ordered in *KenMor Elec. Co., Inc.*, 355 N.L.R.B. No. 173, 2010 WL 3463868 ("August Order"), it would not grant any further relief "even were we to proceed and find that [IEC-Houston's referral service's] continued operation continued to violate

---

[2] *Liquor Salesmen's Union Local 2 v. NLRB*, 664 F.2d 1200, 1206 n.8 (D.C. Cir. 1981) (citation omitted) (ruling that an "adverse effect in fact" is required for a party to have standing under 29 U.S.C. § 160(f)).

the Act."   The Board concluded: "A second finding combined with a second remedy would be entirely redundant . . . . [and] we dismiss the allegations concerning the operation of the referral service on the grounds that their adjudication would not further the remedial purposes of the Act."

The General Counsel is  correct that IEC-Houston was not "aggrieved" by the September Order, and as such, has no standing to appeal that order.  IEC-Houston argues that the September Order adopts the August Order and thus operates against it, but that is incorrect.  Rather, the Board determined in the September Order that making findings and ordering relief against IEC-Houston *would be* redundant, so it did not do so; instead, it dismissed the allegations, which in no way adversely affected IEC-Houston.

Our lack of jurisdiction over the September Order has only a limited effect on the scope of our review.  The General Counsel correctly notes that, without such jurisdiction, we cannot consider evidence that was presented as part of the second case.  *See* Fed. R. App. P. 16(a) ("The record on review or enforcement of an agency order consists of: (1) the order involved; (2) any findings or report on which it is based; and (3) the pleadings, evidence, and other parts of the proceedings before the agency.").  If the evidence supporting the August Order is otherwise sufficient, the additional evidence presented in the second case cannot render the August Order erroneous.

The majority's opinion relegates this jurisdictional issue to a footnote, and dismisses it without referencing any supportive authority.  In fact, the majority cites *Deaton Truck Line, Inc. v. NLRB*, 337 F.2d 697, 698 (5th Cir. 1964), which—according to the majority's own words—"supports the proposition that Section 10(f)—29 U.S.C. § 160(f)—limits the right to review to parties aggrieved

No. 10-60822

by a final Board order and that an employer is not aggrieved if he objected only to findings and conclusions underlying a Board order dismissing a complaint, not to the order itself." This is improper, and I dissent from the majority on this limited but important jurisdictional issue.

> 2. *IEC-Houston has Waived its Due Process and Improper "Hybrid Disparate Impact Theory of Liability" Arguments, and, Regardless, the Arguments Fail.*

We also lack jurisdiction to consider the first two of IEC-Houston's merit-based arguments because IEC-Houston did not previously object to the Board's orders through a motion for reconsideration or otherwise. Even if we could consider those arguments, though, they fail on the merits. IEC-Houston's three arguments on appeal are: (1) the Board denied IEC-Houston due process of law by finding a violation of § 8(a)(1) that was neither pleaded nor litigated; (2) adoption of a "hybrid disparate impact theory of liability" by the Board is error because it is not permitted by the NLRA or supported by substantial evidence in the record as a whole; and (3) the Board's finding of a violation of § 8(a)(1) is not supported by substantial evidence or the NLRA.

The Supreme Court has held that, since the Board's regulations provide "that any material error in the Board's decision may be asserted through a motion for 'reconsideration, rehearing, or reopening of the record', [a] [r]espondent therefore cannot assert its objection on appeal 'unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.'" *Int'l Ladies' Garment Workers' Union v. Quality Mfg. Co.*, 420 U.S. 276, 281 n.3 (1975) (quoting 29 U.S.C. § 160(e)); *accord Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665-66 (1982).

> a. *Due Process Argument*

24

No. 10-60822

IEC-Houston contends it was denied due process because the Board found that IEC-Houston committed an independent violation of § 8(a)(1), even though the Union's charges and the General Counsel's complaint alleged only hiring discrimination under § 8(a)(3) and a subsidiary violation of § 8(a)(1). Indeed, the administrative law judge's ("ALJ") decision rested on § 8(a)(3), but the Board's decision did not.

The Union correctly argues that IEC-Houston has waived this due process argument. Section 10(e) of the NLRA states that a court may not consider an objection not raised before the Board "unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). Logically, IEC-Houston could not have raised its due process argument regarding the Board's "novel theory of liability" *before* the Board issued its decision, but it could have raised the argument on a motion for reconsideration under 29 C.F.R. § 102.48(d)(1).

The Supreme Court has specifically held that when an employer neglects to file a motion for reconsideration before the Board, the employer waives its argument that it was denied due process because the Board based its ruling on an uncharged theory of liability under § 8(a)(1). *Int'l Ladies' Garment Workers' Union*, 420 U.S. at 281 n.3 (holding that because the employer "failed to file a petition for reconsideration as permitted by Board Rules and Regulations," the employer could not assert its objection on appeal).

That is precisely the situation here. It makes no difference that the due process issue was discussed in the Board's majority opinion and dissent. *Woelke & Romero*, 456 U.S. at 665-66 (issue waived when party did not file motion for reconsideration, even though Board addressed issue); *NLRB v. Ferguson Elec.*

25

*Co., Inc.*, 242 F.3d 426, 435 (2d Cir. 2001) ("Even when the Board itself raises and decides an issue *sua sponte*, an objection must be filed with the Board to preserve the issue for a reviewing court."). Because IEC-Houston had the ability to file a motion for reconsideration, there are no extraordinary circumstances that would justify it raising this issue without having brought its objection before the Board. *See Gulf States Mfg. Inc. v. NLRB*, 704 F.2d 1390, 1396-97 (5th Cir. 1983) (finding no jurisdiction to hear an argument not raised before the Board because extraordinary circumstances did not exist—the party could have raised the issue in supplement to its objections or in a motion for reconsideration of the Board's decision).

IEC-Houston asserts that it did raise a due process objection in its exceptions to the ALJ's decision. In those exceptions, IEC-Houston stated that it was denied due process of law because issues concerning the $50 fee, the shared man program, and its failure to give applicants information were not fully and fairly litigated. These objections, however, in no way informed the Board that IEC-Houston was objecting to the Board's finding of an independent violation under § 8(a)(1) when the complaint alleged discrimination under § 8(a)(3).

IEC-Houston also argues that, given the 15-year duration of these cases, "the last thing the Board needs is more time to reconsider its decision," and that any motion for reconsideration would have been futile. This unsupported legal conclusion, however, does not demonstrate that a motion for reconsideration would have been futile. *Cf. NLRB v. Robin Am. Corp.*, 667 F.2d 1170, 1171 (5th Cir. 1982) (holding a party's argument was not waived when an objection to the Board would have been futile because the decision changing the applicable legal

No. 10-60822

standard and providing the basis for the objection did not come until the case was already before the court of appeals).  IEC-Houston does not satisfactorily argue any retroactive changed legal standard that would justify its failure to object to the Board's orders.  IEC-Houston has thus waived its due process argument.

Again, the majority's opinion improperly dismisses this jurisdictional issue.  In fact, the majority cites a decision from our circuit holding that, "absent extraordinary circumstances, the failure to raise an argument before the Board renders us without jurisdiction to consider that argument . . . . This rule is mandatory, not discretionary." *Houston Bldg. Servs.*, 128 F.3d 860, 863 (5th Cir. 1997) (internal quotation marks and citation omitted).  Therefore, I dissent from the majority regarding its consideration of the merits of IEC-Houston's due process.

Even if IEC-Houston had not waived this argument, however, the Board's reliance on § 8(a)(1) does not violate IEC-Houston's due process rights.  The Board may find an unalleged violation if (1) "the issue is closely connected to the subject matter of the complaint" and (2) "has been fully litigated." *Pergament United Sales, Inc.*, 296 NLRB 333, 334 (1989), *enf'd*, 920 F.2d 130 (2d Cir. 1990). Under the "closely connected" standard, the employer must be informed of "the acts forming the basis of the complaint," but not necessarily "the legal theory upon which the General Counsel intends to proceed." *Pergament*, 920 F.2d at 135.

The NLRB has held that a finding of a § 8(a)(1) violation when the complaint alleged only a § 8(a)(3) violation does not violate due process when both allegations "plainly focus on the same set of facts . . . ." *Cardinal Home*

No. 10-60822

*Prods., Inc.*, 338 NLRB 1004, 1007 (2003). That is clearly the case here. This is not a case, as the majority writes, in which the legal violation found by the Board raises entirely different issues from the legal violation charged. *See Champion Int'l Corp.*, 339 NLRB 672, 673 (2003) (distinguishing *Pergament* and *Cardinal*, and finding a due process violation where the alleged and actual violations differed substantially). To the contrary, the issue of hiring discrimination has been fully and fairly litigated; indeed, most of the parties' arguments go to that issue. Moreover, to the extent that the Board's decision is based on admissions in the IEC-Houston newsletter, any risk of unfair surprise to IEC-Houston is mitigated. *See Pergament*, 920 F.2d at 136 (finding no due process violation when a shift in the legal theory was based on the employer's own testimonial admission).

The majority's attempt at distinguishing *Pergament* is unavailing. It asserts "[t]he problem with *Pergament*, and the related cases cited by the NLRB,[3] is that they extended the same operative facts of the charge to other, well-defined theories of violation." Nevertheless, as further discussed below in part B, a § 8(a)(1) violation *is* a well-defined theory of violation. Thus, in addition to having been waived, IEC-Houston's due process argument is meritless.

  b. *"Hybrid Disparate Impact Theory of Liability" Argument*

IEC-Houston argues that "extraordinary circumstances" exist giving this court jurisdiction to adjudicate this second argument despite IEC-Houston's failure to object to the Board's orders because "the Board was outside the orbit

---

[3] *Casino Ready Mix, Inc. v. NLRB*, 321 F.3d 1190, 1200 (D.C. Cir. 2003) (quoting *Pergament*, 296 NLRB at 334); *Cardinal*, 338 NLRB at 1007 (same); *Williams Pipeline Co.*, 315 NLRB 630, 630 (1994) (same).

No. 10-60822

of its authority when it decided to import Title VII disparate impact theory to the NLRA."

Circuit courts may exercise jurisdiction over objections where the Board has "patently travelled outside the orbit of its authority." *NLRB v. Blake Constr. Co.*, 663 F.2d 272, 284 n.34 (D.C. Cir. 1981) (citing, e.g., *NLRB v. Cheney Cal. Lumber Co.*, 327 U.S. 385, 388 (1946). Here, however, the Board did not patently travel outside its orbit of authority. The fact that the Board changed the basis for the violation and declared a § 8(a)(1) violation does not justify an exception to § 10(e) requirements. *See Int'l Ladies' Garment Workers Union*, 420 U.S. at 281 n.3.

Furthermore, IEC-Houston's assertion that the NLRA, unlike Title VII, "does not allow disparate impact as a theory of liability" is immaterial to our review. The Board explicitly stated it was not relying on a disparate impact theory to support its unfair labor practice finding. The Board simply found that the referral system had an inherent tendency to interfere with union-affiliated and salt applicants, and did not discuss any effect on non-union applicants. The General Counsel is correct that "it is no defense for IEC-Houston to . . . insist that the consequences of the system fell to some extent on both [union and non-union] categories of applicants." The majority's finding that there could not have been any anti-union animus because the referral system predated the Union's COMET campaign is likewise immaterial because the Board's ruling was not dependent on animus.

For these reasons, IEC-Houston's argument that the Board has patently travelled outside the orbit of its authority in declaring a § 8(a)(1) violation fails. Therefore, there were no "exceptional circumstances" justifying IEC-Houston's

failure to object to the Board's order through a motion for reconsideration or otherwise, and we are without jurisdiction to consider IEC-Houston's "hybrid disparate impact theory of liability" argument.

B.    *The Board's finding of a violation of § 8(a)(1) is supported by substantial evidence.*

I also dissent from the majority and maintain that substantial evidence supports the Board's finding of a § 8(a)(1) violation.  We affirm the Board's factual determinations if they are supported by substantial evidence.  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 633 (5th Cir. 2003) (quoting *Universal Camera*, 340 U.S. at 477).  Pursuant to this standard, "the ALJ's decision must be upheld if a reasonable person could have found what the ALJ found, even if the appellate court might have reached a different conclusion . . . ."  *Valmont Indus. v. NLRB*, 244 F.3d 454, 463 (5th Cir. 2001) (internal quotation marks and citation omitted).  We must also consider evidence in the record that detracts from the Board's findings.  *Asarco, Inc. v. NLRB*, 86 F.3d 1401, 1406 (5th Cir. 1996).

The standard of review for questions of law decided by the Board is *de novo*, and we affirm if the NLRB provides a "reasonably defensible" interpretation of the Act.  *Standard Fittings Co. v. NLRB*, 845 F.2d 1311, 1314 (5th Cir. 1988) (citing, e.g., *Pattern Makers' League v. NLRB*, 473 U.S. 95 (1985)).  Therefore, we defer to the legal conclusions of the Board if reasonably grounded in the law and not inconsistent with the NLRA.  *Tellepsen Pipeline Servs. Co., v. NLRB*, 320 F.3d 554, 559 (5th Cir. 2003) (citing *Valmont*, 244 F.3d at 464).  "With respect to mixed questions of law and fact, this court must

sustain the Board's application of its legal interpretations to the facts of the particular case when supported by substantial evidence based upon the record considered as a whole." *Tellepsen*, 320 F.3d at 559 (citing *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 501 (1978)).

Section 8(a)(1) of the NLRA (29 U.S.C. § 158(a)(1)) penalizes an employer that attempts "to interfere with, restrain, or coerce employees in the exercise" of their § 7 rights.  Section 7 of the NLRA (29 U.S.C. § 157) gives employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities . . . ."  Again, the Supreme Court has held that this right to self-organization includes the right to seek work as a union member, organizer, or salt without penalty.  *NLRB v. Town & Country*, 516 U.S. at 87, 90-92 (holding paid salts are protected as "employees" under the NLRA).

A ruling that an employer violated § 8(a)(1) "does not depend on the [employer's] motive or the success or failure of the coercion, but depends instead on whether the [employer] engaged in conduct that may *reasonably tend to* interfere with the free exercise of rights under the Act." *Naomi Knitting Plant*, 328 NLRB 1279, 1280 (1999) (emphasis added); *see also Mobil Exploration & Producing U.S., Inc. v. NLRB*, 200 F.3d 230, 239 (5th Cir. 1999) (quoting *Crown Cent. Petroleum Corp. v. NLRB*, 430 F.2d 724, 729 (5th Cir.1970)) ("[I]t is the tendency of an employer's conduct to interfere with the rights of his employees protected by Section 8(a)(1), rather than his motives, that is controlling.").

The employer's conduct need only *reasonably tend to* interfere with § 7 rights, and if such a tendency is found, "the burden is on the employer to demonstrate a legitimate and substantial business justification for its conduct."

No. 10-60822

*ANG Newspapers*, 343 NLRB 564, 565 (2004). "Initially, the responsibility to draw the line between these conflicting rights rests with the Board, and *its determination, unless illogical or arbitrary, ought not be disturbed.*" *Crown*, 430 F.2d at 730 (emphasis added) (internal quotation marks and citation omitted).

IEC-Houston argues that its referral operation as a whole cannot violate § 8(a)(1) if the individual components of the operation are lawful. In his dissent from the August Order, Board Member Schaumber refers to the Board majority's reasoning in this regard as "reverse alchemy, through which lawful policies, when combined, are transmuted into a violation of the Act." Both IEC-Houston and Member Schaumber are wrong. We have specifically ruled that separate incidents, though lawful when viewed in isolation, must be considered collectively to determine whether a violation of § 8(a)(1) has occurred. *NLRB v. Builders Supply Co. of Houston*, 410 F.2d 606, 608 (5th Cir. 1969) (internal quotation marks and citation omitted) ("Certainly, if we isolate each incident and examine it separately, there is little to suggest any unlawful activity on the part of the respondent. But viewing these incidents collectively, as we must, . . . , we are constrained to hold that they amounted at the very least to an uncoordinated pattern of coercion."); *see also Progressive Elec., Inc. v. NLRB,* 453 F.3d 538, 548 (D.C. Cir. 2006) (internal quotation marks and citation omitted) ("While we doubt any of these actions . . . would be independently sufficient, the Board reasonably found they were collectively part and parcel of [the employer's] overall scheme to refuse to consider and hire the Union Applicants.").

The Board thus properly ruled that, viewed in its totality, IEC-Houston's "closed and opaque" system was harmful to union salts. The referral system and shared man program, standing alone, had a reasonable tendency to interfere

No. 10-60822

with the salts' § 7 rights.  The anti-union explanation for these programs contained in the IEC-Houston newsletters, and the fact that Lockwood, Rath, and Gafford were not hired despite the great demand for skilled electricians in the Houston area during this period, only further buttress the Board's ruling. Therefore, we ought not disturb the Board's conclusion that IEC-Houston's referral operation, as a whole, "interfered with the right of job applicants who were union members and 'salts' to be hired on an equal basis with other nonunion applicants."[4]

The majority's opinion runs counter to the Act's express policy of "encouraging practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions [] by restoring equality of bargaining power between employers and employees."  29 U.S.C. § 151.  Substantial evidence supports the Board's well-reasoned August Order, and I therefore dissent from my colleagues and would deny the petition for review and grant the cross-petition for enforcement.

---

[4] IEC-Houston's argument that, by using the phrase "equal basis," the Board was implying that an employer must hire union and non-union employees on a 50-50 basis is incorrect.  Rather, the Board is referring to the unlawfulness of discriminating against union-affiliated applicants.